**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

**CASE NO. _____**

| | |
|---|---|
| **HUMAN RIGHTS DEFENSE CENTER**<br><br>                          **Plaintiff,**<br><br>**vs.**<br><br>**CASANDRA SKINNER HOEKSTRA, ERIK A. HOOKS, TIM MOOSE, DOUG PARDUE, DARCELL CARTER, LARRY DUNSTON, GARRY BLEEKER, ZACHARY KENDALL, individually and in their official capacities, DOES 1-30 in their individual and official capacities, and THE NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY**<br><br>                          **Defendants.** | **COMPLAINT** |

## I.      INTRODUCTION

1.      Plaintiff Human Rights Defense Center ("HRDC") brings this action to enjoin Defendants' improper censorship of its monthly magazines—*Prison Legal News* and *Criminal Legal News*—and other publications that HRDC sends to prisoners in the prison facilities operated by the North Carolina Department of Public Safety ("NCDPS").

2.      Defendants have adopted and implemented mail policies and practices prohibiting delivery of written speech from HRDC while failing to provide due process—namely, an opportunity to challenge that censorship.  Defendants' actions violate HRDC's rights under the First and the Fourteenth Amendments of the United States Constitution.  HRDC thus brings this action, pursuant to 42 U.S.C. § 1983, seeking injunctive and declaratory relief and damages to be proven at trial.

## II.    JURISDICTION AND VENUE

3.    This action arises under the First and Fourteenth Amendments of the United States Constitution and is predicated upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured to HRDC by the laws of the United States.

4.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over claims seeking declaratory, injunctive, and monetary relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure, as well as claims for nominal and compensatory damages against all Defendants.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  On information and belief, at least one Defendant resides within this judicial district, and many of the events giving rise to the claims asserted herein occurred within this judicial district.  On information and belief, all Defendants are residents of the state of North Carolina.

## III.    PARTIES

6.    HRDC is a not-for-profit charitable corporation recognized under § 501(c)(3) of the Internal Revenue Code, incorporated in the State of Washington and with its principal place of business in Lake Worth, Florida.  Founded in 1990, HRDC publishes the monthly newsprint magazine *Prison Legal News* ("PLN"), the longest-running independent newsprint publication concerning prisons and detention centers in the United States.  HRDC also publishes *Criminal Legal News* ("CLN"), which provides cutting edge review and analysis of individual rights, court rulings, and news concerning criminal justice-related issues.

7.    HRDC corresponds regularly with prisoners on constitutional issues and potential violations of their civil rights.  The purpose of HRDC is to educate prisoners and the public

about the destructive nature of racism, sexism, and the economic and social costs of prisons to society.

8.     Defendant Darcell Williams Carter ("Carter"), on information and belief, served as a Member and/or the Chair of the PRC during the relevant time period. In her role as a Member of the PRC, Defendant Carter conducted independent reviews of disapproved publications and materials that were not delivered to NCDPS prisoners. In her role as the Chair of the PRC, Defendant Carter oversaw the PRC, serving as the final approval authority when the PRC's members could not come to a consensus. When the PRC decided to reject certain publications, Defendant Carter was also responsible for notifying the relevant publisher and prisoner of the PRC's decision. As to all claims presented herein against her, Defendant Carter is being sued in her official capacity for injunctive and declaratory relief, and in her individual capacity for damages and for injunctive and declaratory relief. At all relevant times, Defendant Carter has acted under color of state law.

9.     Defendant Erik A. Hooks ("Hooks"), on information and belief, was the Secretary of NCDPS from January 5, 2017 through August 1, 2021. During his time as Secretary, Defendant Hooks had ultimate responsibility for the promulgation and implementation of NCDPS policies, procedures, and practices and for the management of NCDPS. As to all claims presented herein against him, Defendant Hooks is being sued in his official capacity for injunctive and declaratory relief, and in his individual capacity for damages and for injunctive and declaratory relief. At all relevant times, Defendant Hooks has acted under color of state law.

10.     Defendant Casandra Skinner Hoekstra ("Hoekstra"), on information and belief, has served as the Interim Secretary of NCDPS since August 1, 2021. In this role, Defendant

Hoekstra has ultimate responsibility for the promulgation and implementation of NCDPS policies, procedures, and practices and for the management of NCDPS. As to all claims presented herein against her, Defendant Hoekstra is being sued in her official capacity for injunctive and declaratory relief, and in her individual capacity for damages and for injunctive and declaratory relief. At all relevant times, Defendant Hoekstra has acted under color of state law.

11.     Defendant Timothy Darryl Moose ("Moose"), on information and belief, has served as the Chief Deputy Secretary of the Division of Adult Correction and Juvenile Justice within NCDPS since June 2019. In this role, Defendant Moose oversees the agencies and personnel responsible for supervising NCDPS facilities, and thus has responsibility for the implementation of NCDPS policies, procedures, and practices. As to all claims presented herein against him, Defendant Moose is being sued in his official capacity for injunctive and declaratory relief, and in his individual capacity for damages and for injunctive and declaratory relief. At all relevant times, Defendant Moose has acted under color of state law.

12.     Defendant Doug Pardue ("Pardue"), on information and belief, served as a Member and/or the Chair of the NCDPS Publications Review Committee ("PRC") during the relevant time period. The PRC is the body within NCDPS that is responsible for reviewing a publication that has been withheld from a prisoner by a Warden or a Superintendent at an NCDPS facility and making the ultimate determination as to whether said publication may be delivered to that prisoner. In this role, Defendant Pardue oversaw the PRC, serving as the final approval authority when the PRC's members could not come to a consensus. When the PRC decided to reject certain publications, Defendant Pardue was also responsible for notifying the relevant publisher and prisoner of the PRC's decision. As to all claims presented herein against

him, Defendant Pardue is being sued in his official capacity for injunctive and declaratory relief, and in his individual capacity for damages and for injunctive and declaratory relief. At all relevant times, Defendant Pardue has acted under color of state law.

13. Defendant Larry Michael Dunston ("Dunston"), on information and belief, served as a Member and/or the Chair of the PRC during the relevant time period. In his role as a Member of the PRC, Defendant Dunston conducted independent reviews of disapproved publications and materials that were not delivered to NCDPS prisoners. In his role as the Chair of the PRC, Defendant Dunston oversaw the PRC, serving as the final approval authority when the PRC's members could not come to a consensus. When the PRC decided to reject certain publications, Defendant Dunston was also responsible for notifying the relevant publisher and prisoner of the PRC's decision. As to all claims presented herein against him, Defendant Dunston is being sued in his official capacity for injunctive and declaratory relief, and in his individual capacity for damages and for injunctive and declaratory relief. At all relevant times, Defendant Dunston has acted under color of state law.

14. Defendant Garry Hubert Bleeker ("Bleeker"), on information and belief, served as a Member and/or the Chair of the PRC during the relevant time period. In his role as a Member of the PRC, Defendant Bleeker conducted independent reviews of disapproved publications and materials that were not delivered to NCDPS prisoners. In his role as the Chair of the PRC, Defendant Bleeker oversaw the PRC, serving as the final approval authority when the PRC's members could not come to a consensus. When the PRC decided to reject certain publications, Defendant Bleeker was also responsible for notifying the relevant publisher and prisoner of the PRC's decision. As to all claims presented herein against him, Defendant Bleeker is being sued in his official capacity for injunctive and declaratory relief, and in his individual capacity for

damages and for injunctive and declaratory relief. At all relevant times, Defendant Bleeker has acted under color of state law.

15. Defendant Zachary Richard Kendall ("Kendall"), on information and belief, served as a Member and/or the Chair of the PRC during the relevant time period. In his role as a Member of the PRC, Defendant Kendall conducted independent reviews of disapproved publications and materials that were not delivered to NCDPS prisoners. In his role as the Chair of the PRC, Defendant Kendall oversaw the PRC, serving as the final approval authority when the PRC's members could not come to a consensus. When the PRC decided to reject certain publications, Defendant Kendall was also responsible for notifying the relevant publisher and prisoner of the PRC's decision. As to all claims presented herein against him, Defendant Kendall is being sued in his official capacity for injunctive and declaratory relief, and in his individual capacity for damages and for injunctive and declaratory relief. At all relevant times, Defendant Kendall has acted under color of state law.

16. The true names and identities of the John Doe Defendants are presently unknown to HRDC. Each of the Doe Defendants is or was employed by and are or was an agent of NCDPS when some or all of the challenged rejections of HRDC's publications took place. Each of the Doe Defendants was personally involved in the adoption and/or implementation of the publication policies and practices at the NCDPS facilities, and/or was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and/or control of NCDPS facilities staff who interpret and implement these publication policies. HRDC will seek to amend this Complaint as soon as the true names and identities of the Doe Defendants have been ascertained.

17.     Defendant NCDPS is the state agency that manages the correctional facilities within the State of North Carolina.  NCDPS is responsible for the promulgation and implementation of policies, procedures, and practices that restrict the delivery of publications to prisoners incarcerated in North Carolina state facilities.  As to all claims presented herein, Defendant NCDPS is being sued for injunctive and declaratory relief.

## IV.     FACTUAL ALLEGATIONS

### A.     HRDC'S MISSION

18.     For more than 30 years, the focus of HRDC's mission has been public education, advocacy, and outreach on behalf of, and for the purpose of assisting, prisoners who seek legal redress for infringements of their constitutionally guaranteed and other basic human rights. HRDC engages in core protected speech and expressive conduct on matters of public concern, such as the operation of prison facilities, prison conditions, prisoner health and safety, and prisoners' rights.  HRDC's mission, if realized, has a salutary effect on public safety.

19.     In furtherance of its mission, HRDC publishes and distributes a softcover monthly magazine titled *Prison Legal News*, which reports on prisons, jails, and other detention facilities, prisoners' rights, court rulings, management of prison facilities, prison conditions, and other matters pertaining to the rights and interests of incarcerated individuals.  The award-winning monthly magazine is published on newsprint and is 72-pages long.

20.     In 2017, HRDC also began publishing a second monthly magazine, *Criminal Legal News*.  This magazine focuses on review and analysis of individual rights, court rulings, and news concerning criminal justice-related issues.  This magazine is also published on newsprint and is 56 pages long.

21.     HRDC also publishes an Annual Report.  The Annual Report provides details on HRDC's accomplishments from the previous year and explains the steps that HRDC is taking to fulfill its mission.

22.     HRDC's publications, as described above, contain political speech and social commentary, which are core First Amendment rights and are entitled to the highest protection afforded by the United States Constitution.

23.     HRDC's publications have thousands of subscribers in the United States and abroad, including prisoners, attorneys, journalists, public libraries, judges, and members of the general public.  HRDC has distributed its monthly publication to prisoners and law librarians in more than 3,000 correctional facilities located across all 50 states, including the Federal Bureau of Prisons and NCDPS.

24.     *Prison Legal News* is popular among prisoners in NCDPS facilities.  Despite Defendants' censorship, as of September of 2021, HRDC had 162 subscribers spread across 33 NCDPS facilities.

25.     *Criminal Legal News* is also quite popular among innates in NCDPS facilities. Despite Defendants' censorship, as of September of 2021, HRDC had 70 subscribers spread across 23 NCDPS facilities.

26.     Additionally, in furtherance of its mission and to increase the dissemination of its message, HRDC sends individually addressed sample copies of its publications to non-subscriber prisoners within the NCDPS system.

**B.     CENSORSHIP BY THE NCDPS**

27.     The First Amendment of the United States Constitution protects HRDC's right to communicate with prisoners who are incarcerated within NCDPS facilities.  Regulations,

policies, or practices that restrict the receipt of publications by prisoners are invalid unless they are reasonably related to legitimate penological interests.

28.     The Fourteenth Amendment of the United States Constitution requires that publishers receive notice of and be allowed to challenge restrictions on prisoners' receipt of mail. Regulations, policies, or practices that do not provide these minimum procedural safeguards are invalid. Fourteenth Amendment rights are also violated where procedural safeguards are not followed as applied to a particular publisher.

29.     On December 12, 2006, Joseph Urbaniak, Jr., a prisoner at North Carolina's Harnett Correctional Institution ("Harnett"), brought an action pursuant to 42 U.S.C. § 1983 against several officials at Harnett. *See Urbaniak v. Stanley*, NO. 5:06-CT-3135-FL, Order Approving Settlement Agreement, at 2 ("*Urbaniak*"). Mr. Urbaniak alleged that the defendants violated his First Amendment rights by arbitrarily and capriciously denying access to publications without referring to a legitimate penological interest. Mr. Urbaniak also alleged that the defendants violated his Fourteenth Amendment rights by failing to provide Mr. Urbaniak with the opportunity to appeal rejected publications.

30.     In connection with the resolution of the *Urbaniak* case by consent decree and settlement agreement, North Carolina's Department of Corrections ("DOC") (which has since been merged into the NCDPS) adopted a revised publication policy—entitled *Publications Received/Possessed by Inmates* ("Publication Policy"). The consent decree provided that, among other obligations, the "DOC must uniformly follow its written policy . . . ."

31.     Section D.0109(f) of the Publication Policy allows NCDPS to withhold publications that "can be reasonably documented to contain . . . [t]hreats to institutional safety

and security." These "threats to institutional safety and security" include "materials which depict, describe or advocate or which include" among other things:

- "the commission of criminal activity and/or the violation of state or federal laws and/or the violation of the Division of Prisons policy and/or inmate disciplinary policy and procedures" ("Reason A");

- "the manufacture, simulation and/or concealment of weapons, ammunition, explosives, incendiaries, or escape devices and/or escape techniques" ("Reason B");

- "violence, disorder, insurrection or terrorist/gang activities against individuals, groups, organizations, the government or any of [its] institutions" ("Reason D");

- "instructions and/or information, which may be used to alter or defeat institutional systems of communication" ("Reason F");

- "violence against any ethnic, racial or religious group or which reasonably appears likely to provoke or to precipitate a violent confrontation between the recipient or recipients or any other inmate in possession of same and a member or members of the target group" ("Reason H"); and

- "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity" ("Reason K").

32.     Section D.0107 provides that, when a publication mailed to a prisoner is rejected, "the publisher shall be notified in writing of the reason for rejection and the procedure to follow to appeal the rejection . . . ." *Id.* at Section D.0107.  Section D.0107 further states that "[i]f the publisher appeals, the Division of Prisons will notify the publisher of the outcome of the review within fifteen (15) days of receipt of a timely submitted written request for review."

33. The Defendants have administered the Publication Policy in a manner that does not comply with the First and/or Fourteenth Amendments. Defendants' policies and practices have deprived and will continue to deprive HRDC of the right to distribute its materials to prisoners, and of notice or opportunity to appeal when its publications are not delivered to prisoner subscribers.

34. As described in further detail below, the NCDPS has withheld issues of *Prison Legal News*, *Criminal Legal News*, and HRDC's Annual Report. HRDC is informed and thereon believes that Defendants had direct knowledge of and were directly involved in each and every instance of censorship complained of below.

35. *Prison Legal News* and *Criminal Legal News* pose no threat to any legitimate penological interests. However, in numerous instances NCDPS officials erroneously rejected issues of *Prison Legal News* and *Criminal Legal News*, on the grounds that the content of the magazines violated Section D.0109(f) of the Publication Policy.

36. Between January 2019 and August 2021, the NCDPS censored 14 monthly issues of *Prison Legal News*, five monthly issues of *Criminal Legal News*, and HRDC's 2017 and 2019 Annual Reports. *See* Exhibit A (Summary of Improper Censorship).

37. On at least one occasion, NCDPS failed to comply with Section D.0107 of the Publication Policy by failing to provide any notice to HRDC that one of its publications mailed to a prisoner had been rejected.

38. Further, on 13 occasions, NCDPS failed to comply with Section D.0107 of the Publication Policy by simply ignoring HRDC's appeals of the Department's decisions and failing to notify HRDC of the outcome of these appeals within the allotted time.

39.     HRDC is aware of at least the following specific examples of improper censorship and/or lack of due process by the NCDPS:

***Censorship of Prison Legal News***

40.     HRDC is informed and believes and thereon alleges that prisoner subscribers incarcerated in NCDPS facilities did not receive 14 issues of *Prison Legal News*.

41.     HRDC is informed and believes and thereon alleges that NCDPS officials prevented prisoners at NCDPS facilities from receiving the December 2018, January 2019, December 2019, February 2020, April 2020, June 2020, July 2020, September 2020, October 2020, November 2020, December 2020, April 2021, May 2021, and June 2021 issues of *Prison Legal News*. HRDC is informed and believes that, although each of those issues was properly delivered to NCDPS facilities, the issues were withheld from delivery by NCDPS officials.

42.     On January 23, 2019, NCDPS mailed HRDC a letter notifying HRDC that the December 2018 issue of *Prison Legal News* was "disapproved for delivery to the inmate." According to the letter, pages one through four of this issue violated Section D.0109(f) by virtue of Reason A.

43.     None of the content of the pages cited in the January 23, 2019 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security. Instead, these pages contained a portion of an article about censorship in prisons and jails and HRDC's litigation efforts to combat this censorship. These pages also contained a notice for HRDC's 2018 fundraiser, which highlights HRDC's accomplishments from the last year.

44.     On February 25, 2019, HRDC received a letter from an individual incarcerated at NCDPS' Marion Correctional Institution. The letter contained a notice that NCDPS had provided to the individual explaining that the January 2019 issue of *Prison Legal News* had been

disapproved.  At no point did HRDC receive a letter from NCDPS informing HRDC of the decision to disapprove the January 2019 issue of *Prison Legal News*.

45.     According to the letter that this individual received, NCDPS claimed that pages 50, 51, 53, 54, and 56 of this issue violated Section D.0109(f) of the Publication Policy by virtue of Reason A.

46.     None of the content of the pages cited in the February 25, 2019 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security.  Instead, these pages contained articles factually describing investigations into lawsuits stemming from, and prisoner reports of, prison official misconduct.

47.     On January 24, 2020, NCDPS mailed HRDC a letter notifying HRDC that the December 2019 issue of *Prison Legal News* had been "disapproved for delivery to the inmate." According to the letter, pages 1 and 28 of this issue violated Section D.0109(f) by virtue of Reason D.

48.     None of the content of the pages cited in the January 24, 2020 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security.  Instead, these pages contained an article about the insufficient educational resources at a Florida prison and a factual description of an incident at an Ohio prison.

49.     HRDC appealed NCDPS' decision to censor the December 2019 issue of *Prison Legal News*.  However, NCDPS never responded to this appeal.

50.     On February 26, 2020, NCDPS mailed HRDC a letter notifying HRDC that the February 2020 issue of *Prison Legal News* had been "disapproved for delivery to the inmate." According to the letter, page 46 of this issue violated Section D.0109(f) by virtue of Reason B.

51.     None of the content of the page cited in the February 26, 2020 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security. Instead, this page contained a factual description of a documentary about the conditions at a certain facility and the extreme precautions prisoners at that facility must undertake to protect themselves in light of the general indifference of prison officials.

52.     HRDC appealed NCDPS' decision to censor the February 2020 issue of *Prison Legal News*. However, NCDPS never responded to this appeal.

53.     On May 15, 2020, NCDPS mailed HRDC a letter notifying HRDC that the April 2020 issue of *Prison Legal News* had been "disapproved for delivery to the inmate." According to the letter, page 54 of this issue violated Section D.0109(f) by virtue of Reason K.

54.     None of the content of the cited page can reasonably be considered to contain threats to NCDPS' institutional safety and security. Instead, this page contained an article factually describing a lawsuit against a correctional facility for the negligent supervision of its juvenile prisoners.

55.     HRDC appealed NCDPS' decision to censor the April 2020 issue of *Prison Legal News*. However, NCDPS never responded to this appeal.

56.     On August 5, 2020, NCDPS mailed HRDC a letter notifying HRDC that the June 2020 issue of *Prison Legal News* had been "disapproved for delivery to the inmate." According to the letter, pages 23, 31, and 38 of this issue violated Section D.0109(f) by virtue of Reason D.

57.     None of the content of the pages cited in the August 5, 2020 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security.

58.     HRDC appealed NCDPS' decision to censor the June 2020 issue of *Prison Legal News*. However, NCDPS never responded to this appeal.

59.     On August 20, 2020, NCDPS mailed HRDC a letter notifying HRDC that the July 2020 issue of *Prison Legal News* had been "disapproved for delivery to the inmate." According to the letter, page 20 of this issue violated Section D.0109(f) by virtue of Reason D.

60.     None of the content of the page cited in the August 20, 2020 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security.

61.     On October 19, 2020, NCDPS mailed HRDC a letter notifying HRDC that the September 2020 issue of *Prison Legal News* had been "disapproved for delivery to the inmate." According to the letter, page 19 of this issue violated Section D.0109(f) by virtue of Reason D.

62.     None of the content of the page cited in the October 19, 2020 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security.

63.     HRDC appealed NCDPS' decision to censor the September 2020 issue of *Prison Legal News*. However, NCDPS never responded to this appeal.

64.     On December 10, 2020, NCDPS mailed HRDC a letter notifying HRDC that the November 2020 issue of *Prison Legal News* had been "disapproved for delivery to the inmate." According to the letter, page 26 of this issue violated Section D.0109(f) by virtue of Reason A.

65.     None of the content of the page cited in the December 10, 2020 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security. Instead, this page contained an article factually describing an investigation that concluded that correctional officers consented to and assisted with assaults carried out against prisoners.

66.     HRDC appealed NCDPS' decision to censor the November 2020 issue of *Prison Legal News*. However, NCDPS never responded to this appeal.

67.     On February 8, 2021, NCDPS mailed HRDC a letter notifying HRDC that the December 2020 issue of *Prison Legal News* had been "disapproved for delivery to the inmate."

According to the letter, pages 14-17 of this issue violated Section D.0109(f) by virtue of Reason A.

68.      None of the content of the pages cited in the February 8, 2021 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security.  Instead, these pages contained an article factually describing a death in custody and other potential in-custody deaths.  They also contained an article that factually described a negligence suit for failure to protect a prisoner.

69.      On February 24, 2021, NCDPS mailed HRDC a second letter notifying HRDC of the rejection of the December 2020 issue of *Prison Legal News*.  This letter once again failed to specify the threat that this article posed to NCDPS' institutional safety and security.

70.      HRDC appealed NCDPS' decision to censor the December 2020 issue of *Prison Legal News*.  The NCDPS responded to the appeal, upholding the decision to reject that issue.

71.      On February 24, 2021, NCDPS mailed HRDC a letter notifying HRDC that the October 2020 issue of *Prison Legal News* had been "disapproved for delivery to the inmate." According to the letter, page 44 of this issue violated Section D.0109(f) by virtue of Reason F.

72.      None of the content of page cited in the February 24, 2021 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security.  The letter appears to be referring to page 42, which contained an article factually describing a lawsuit against prison officials arising out of an incident at a California correctional facility.

73.      HRDC appealed NCDPS' decision to censor the October 2020 issue of *Prison Legal News*.  However, NCDPS never responded to this appeal.

74.     On June 10, 2021, NCDPS mailed HRDC a letter notifying HRDC that the April 2021 issue of *Prison Legal News* had been "disapproved for delivery to the inmate."  According to the letter, page 28 of this issue violated Section D.0109(f) by virtue of Reason H.

75.     None of the content of the page cited in the June 10, 2021 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security.  Instead, this page contained an article about a woman who gave birth in a jail cell and an article about bans on Christmas cards in prison.

76.     HRDC appealed NCDPS' decision to censor the April 2021 issue of *Prison Legal News*.  However, NCDPS never responded to this appeal.

77.     On July 16, 2021, NCDPS mailed HRDC a letter notifying HRDC that the June 2021 issue of *Prison Legal News* had been "disapproved for delivery to the inmate."  According to the letter, page 38 of this issue violated Section D.0109(f) by virtue of Reason D.

78.     None of the content of the page cited in the July 16, 2021 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security.  Instead, this page contained: (1) an article about a proposal to rename certain prisons after individuals that owned slaves and leased convict laborers, and (2) an article factually describing North Carolina's use of solitary confinement in its prisons.

79.     On August 9, 2021, NCDPS mailed HRDC a second letter notifying HRDC of the rejection of the June 2021 issue of *Prison Legal News*. This letter once again failed to specify the threat that this article posed to NCDPS' institutional safety and security.

80.     HRDC appealed NCDPS' decision to censor the June 2021 issue of *Prison Legal News*.  However, NCDPS never responded to this appeal.

81.     On August 9, 2021, NCDPS mailed HRDC a letter notifying HRDC that the May 2021 issue of *Prison Legal News* had been "disapproved for delivery to the inmate." According to the letter, pages nine and 11 of this issue violated Section D.0109(f) by virtue of Reason D.

82.     None of the content of the pages cited in the August 9, 2021 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security. Instead, these pages contained an article about the mass incarceration industry.

83.     HRDC appealed NCDPS' decision to censor the May 2021 issue of *Prison Legal News*. However, NCDPS never responded to this appeal.

84.     The censorship of the material as described in the foregoing paragraphs 43-83 is not reasonably related to a legitimate penological interest.

85.     Defendants' censorship of *Prison Legal News*, failure to provide adequate explanation of their decisions to censor *Prison Legal News*, and failure to respond and provide an explanation with regard to each of HRDC's appeals of the Defendants' decisions to censor *Prison Legal News* violates HRDC's First and Fourteenth Amendment rights.

**Censorship of Criminal Legal News**

86.     HRDC is informed and believes and thereon alleges that prisoner subscribers incarcerated in NCDPS facilities did not receive five issues of *Criminal Legal News*.

87.     HRDC is informed and believes and thereon alleges that NCDPS officials prevented prisoners at NCDPS facilities from receiving the December 2018, August 2020, September 2020, December 2020, and January 2021 issues of *Criminal Legal News*. HRDC is informed and believes that, although each of these issues was properly delivered to NCDPS facilities, the issues were withheld from delivery by NCDPS officials.

88.     On February 22, 2019, NCDPS mailed HRDC a letter notifying HRDC that the December 2018 issue of *Criminal Legal News* had been "disapproved for delivery to the inmate." According to the letter, pages 17 and 28 of this issue violated Section D.0109(f) by virtue of Reason D.

89.     None of the content of the pages cited in the February 22, 2019 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security. Instead, these pages contained articles factually describing the deaths of individuals at hands of police officers and allegations of prosecutorial misconduct in death penalty cases.

90.     On September 2, 2020, NCDPS mailed HRDC a letter notifying HRDC that the August 2020 issue of *Criminal Legal News* had been "disapproved for delivery to the inmate." According to the letter, pages 1 and 3 of this issue violated Section D.0109(f) by virtue of Reason D.

91.     None of the content of the pages cited in the September 2, 2020 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security. Instead, these pages contained an article about activism against police brutality in 2020.

92.     On October 22, 2020, NCDPS mailed HRDC a letter notifying HRDC that the September 2020 issue of *Criminal Legal News* had been "disapproved for delivery to the inmate." According to the letter, pages 1 and 3-8 of this issue violated Section D.0109(f) by virtue of Reason D.

93.     None of the content of the pages cited in the October 22, 2020 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security. Instead, these pages contained an article about police violence and the need for reform.

94.     HRDC appealed NCDPS' decision to censor the September 2020 issue of *Criminal Legal News*.  However, NCDPS never responded to this appeal.

95.     On February 19, 2021, NCDPS mailed HRDC a letter notifying HRDC that the January 2021 issue of *Criminal Legal News* had been "disapproved for delivery to the inmate." According to the letter, pages one and three of this issue violated Section D.0109(f) by virtue of Reason D.

96.     None of the content of the pages cited in the February 19, 2021 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security.  Instead, these pages contained an article about the power of police unions.

97.     HRDC appealed NCDPS' decision to censor the January 2021 issue of *Criminal Legal News*.  However, NCDPS never responded to this appeal.

98.     On March 18, 2021, NCDPS mailed HRDC a letter notifying HRDC that the December 2020 issue of *Criminal Legal News* had been "disapproved for delivery to the inmate."  According to the letter, page 24 of this issue violated Section D.0109(f) by virtue of Reason D.

99.     None of the content of the page cited in the March 18, 2021 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security.  Instead, this page contained an article about wrongful convictions stemming from prosecutorial misconduct.

100.    HRDC appealed NCDPS' decision to censor this issue.  However, NCDPS never responded to this appeal.

101.    On information and belief, officials in at least one NCDPS facility, the Nash Correctional Institution, which is located in this judicial district, have implemented a

presumptive ban on the delivery of *Criminal Legal News* altogether and/or otherwise discouraged prisoners from subscribing to *Criminal Legal News*.

102. The censorship of the material as described in the foregoing paragraphs 84-99 is not reasonably related to a legitimate penological interest.

103. Defendants' censorship of *Criminal Legal News*, failure to provide adequate explanation of their decisions to censor *Criminal Legal News*, and failure to respond and provide an explanation with regard to each of HRDC's appeals of the Defendants' decisions to censor *Criminal Legal News* violates HRDC's First and Fourteenth Amendment rights.

***Censorship of HRDC'S Annual Report***

104. HRDC is informed and believes and thereon alleges that the NCDPS censored HRDC's 2017 Annual Report, which was individually addressed and mailed to the subscribers incarcerated in NCDPS' facilities.

105. On January 3, 2019, NCDPS mailed HRDC a letter notifying HRDC that HRDC's 2017 Annual Report had been "disapproved for delivery to the inmate." According to the letter, page 39 of HRDC's 2017 Annual Report violated Section D.0109(f) by virtue of Reason D.

106. None of the content of the page cited in the January 3, 2019 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security. Instead, this page contained an article about a prisoner who makes birthday cakes.

107. On December 17, 2020, NCDPS mailed HRDC a letter notifying HRDC that HRDC's 2019 Annual Report had been "disapproved for delivery to the inmate." According to the letter, pages 23 and 32 of HRDC's 2019 Annual Report violated Section D.0109(f) by virtue of Reason D.

108.    None of the content of the pages cited in the December 17, 2020 letter can reasonably be considered to contain threats to NCDPS' institutional safety and security.  Instead, HRDC's 2019 Annual Report does not contain a "page 32," while page 23 discusses two consumer class action cases regarding jail-issued debit cards.

109.    The censorship of the material as described in the foregoing paragraphs 102-106 is not reasonably related to a legitimate penological interest.

110.    This censorship of HRDC's 2017 and 2019 Annual Reports and the failure of Defendants to provide adequate explanation to HRDC violates HRDC's First and Fourteenth Amendment rights.

* * * *

111.    In adopting and implementing the above censorship policies and practices, and in failing to follow the Publication Policy that NCDPS has in place, Defendants have knowingly violated, continue to violate, and are reasonably expected to violate in the future, HRDC's constitutional rights.

112.    Defendants' unconstitutional policies and practices have caused HRDC serious and irreparable harm including, but not limited to: suppression of its political message and speech; frustration of its organizational mission; loss of its ability to recruit new supporters, subscribers, and writers; loss of subscriptions and customers; loss of opportunities for purchases and sales of its publications; and diversion of its resources.  Absent intervention by this Court, these actions will continue and HRDC will be subjected to a continuation of the same irreparable and serious injuries.

113.    The above violations of HRDC's rights and the harms to HRDC were caused by publication and censorship policies, practices, and customs adopted or approved by Defendants.

114.     The individual Defendants named herein are responsible for, or personally participated in, creating and implementing these unconstitutional publication and censorship policies, practices, and customs, for improperly denying the appeals of the censorship of HRDC's publications, and for training and supervising the NCDPS staff who carry out these policies and whose conduct has injured and continues to injure HRDC.

115.     Defendants' unconstitutional policies, practices, and customs are ongoing and continue to violate HRDC's rights, and as such HRDC has no adequate remedy at law.

116.     HRDC is entitled to declaratory and injunctive relief prohibiting Defendants from refusing to deliver or refusing to allow delivery of HRDC's books and magazines and prohibiting Defendants from censoring HRDC's publications without due process of law.

117.     As a result of the foregoing, HRDC seeks compensatory and punitive damages against the individual Defendants.

## COUNT I
### Violation of the First Amendment (Censorship)
### 42 U.S.C. § 1983

118.     HRDC re-alleges and incorporates by reference herein the allegations of Paragraphs 1 through 117 as if fully set forth herein.

119.     The acts described above constitute violations of HRDC's rights under the First Amendment of the United States Constitution.

120.     HRDC has a constitutionally protected liberty interest in communicating with incarcerated individuals, a right clearly established under existing case law.

121.     The conduct of Defendants was objectively unreasonable and was undertaken recklessly, intentionally, willfully, with malice, and with deliberate indifference to the rights of others.

122. HRDC's injuries and the violations of its constitutional rights were directly and proximately caused by the policies and practices of Defendants, which were and are the moving force of the violations.

123. Defendants' acts described above have caused damages to HRDC, and if not enjoined, will continue to cause damage to HRDC.

124. HRDC seeks declaratory and injunctive relief, and nominal and compensatory damages against all Defendants. HRDC seeks punitive damages against the individual Defendants in their individual capacities.

**COUNT II**
**Violation of the Fourteenth Amendment (Due Process)**
**42 U.S.C. § 1983**

125. HRDC re-alleges and incorporates by reference herein the allegations of Paragraphs 1 through 124 as if fully set forth herein.

126. The acts described above constitute violations of HRDC's rights under the Fourteenth Amendment to the United States Constitution.

127. Because HRDC has a liberty interest in communicating with prisoners, HRDC has a right under the Due Process Clause of the Fourteenth Amendment to receive notice of and an opportunity to appeal Defendants' decisions to censor their written speech.

128. Defendants' policies and practices fail to provide HRDC with adequate notice and an opportunity to be heard. NCDPS has also failed to follow its own policy by failing to provide an explanation of NCDPS' decisions with regard to HRDC's appeals of NCDPS' censorship.

129. The conduct of Defendants was objectively unreasonable and was undertaken recklessly, intentionally, willfully, with malice, and with deliberate indifference to the rights of others.

130.    HRDC's injuries and the violations of its constitutional rights were directly and proximately caused by the policies and practices of Defendants, which are and were the moving force of the violations.

131.    Defendants' acts described above have caused damages to HRDC, and if not enjoined, will continue to cause damage to HRDC.

132.    HRDC seeks declaratory and injunctive relief against NCDPS, and declaratory and injunctive relief and nominal and compensatory damages against all remaining Defendants. HRDC seeks punitive damages against the individual Defendants in their individual capacities.

## RELIEF REQUESTED

WHEREFORE, the Plaintiff respectfully requests judgment against Defendants, jointly and severally, for the following:

**A.**    A declaration that Defendants' policies and practices violate the Constitution;

**B**.    A preliminary and permanent injunction preventing Defendants from continuing to violate the Constitution, and providing other equitable relief;

**C.**    Nominal damages for each violation of HRDC's rights by the Defendants;

**D.**    Compensatory damages in an amount to be proved at trial;

**E.**    Punitive damages against the individual Defendants in an amount to be proved at trial;

**F.**    An award of full costs and attorneys' fees arising out of this litigation, under 42 U.S.C. § 1988 and other applicable law; and

**G.**    Any and other further relief this Court may deem just and appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, HRDC hereby demands a trial by jury in this action of all issues so triable.

November 12, 2021

                          Respectfully submitted,

                          HUMAN RIGHTS DEFENSE CENTER

By:     /s/ Elizabeth Simpson
              Elizabeth Simpson
              EMANCIPATE NC
              NC State Bar # 41596
              P.O. Box 309
              Durham, NC 27702
              elizabeth@emancipatenc.org
              (919) 682-1149

              Ari S. Meltzer (for *pro hac vice*)
              Kyle M. Gutierrez (for *pro hac vice*)
              WILEY REIN LLP
              1776 K Street NW
              Washington, DC 20006
              (202) 719-7000
              ameltzer@wiley.law
              kgutierrez@wiley.law

              Daniel Marshall (for *pro hac vice*)
              Fla. Bar #617210
              Jesse W. Isom (for *pro hac vice*)
              Fla. Bar #98588
              HUMAN RIGHTS DEFENSE CENTER
              P.O. Box 1151
              Lake Worth, FL 33460
              (561) 360-2523
              dmarshall@humanrightsdefensecenter.org
              jwisom@humanrightsdefensecenter.org

## EXHIBIT A

| Notification Date | Banned Issue | Did HRDC Appeal? | Did NCDPS respond? |
|---|---|---|---|
| January 23, 2019 | Dec. 2018 PLN | No | N/A |
| February 25, 2019* | Jan. 2019 PLN | No | N/A |
| January 24, 2020 | Dec. 2019 PLN | Yes | No |
| February 26, 2020 | Feb. 2020 PLN | Yes | No |
| May 15, 2020 | Apr. 2020 PLN | Yes | No |
| August 5, 2020 | June 2020 PLN | Yes | No |
| August 20, 2020 | July 2020 PLN | No | N/A |
| October 19, 2020 | Sept. 2020 PLN | Yes | No |
| December 10, 2020 | Nov. 2020 PLN | Yes | No |
| February 8, 2021 | Dec. 2020 PLN | No | N/A |
| February 24, 2021 | Dec. 2020 PLN | Yes | Yes |
| February 24, 2021 | Oct. 2020 PLN | Yes | No |
| June 10, 2021 | April 2021 PLN | Yes | No |
| July 16, 2021 | June 2021 PLN | No | N/A |
| August 9, 2021 | June 2021 PLN | Yes | No |
| August 9, 2021 | May 2021 PLN | Yes | No |
| February 22, 2019 | Dec. 2018 CLN | No | N/A |
| September 2, 2020 | Aug. 2020 CLN | No | N/A |
| October 22, 2020 | Sept. 2020 CLN | Yes | No |
| February 19, 2021 | Jan. 2021 CLN | Yes | No |
| March 18, 2021 | Dec. 2020 CLN | Yes | No |
| January 3, 2019 | 2017 Annual Report | No | N/A |
| December 17, 2020 | 2019 Annual Report | No | N/A |

* HRDC did not receive a formal notification from NCDPS. HRDC was notified by a prisoner.