**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

HUMAN RIGHTS DEFENSE
CENTER,

                     Plaintiff,

    v.

CASANDRA SKINNER
HOEKSTRA et al.,

               Defendants.

Civil Action No.  5:21-CV-469-FL

**PLAINTIFF HUMAN RIGHTS
DEFENSE CENTER'S
MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT
Fed. R. Civ. P. 56**

Ari S. Meltzer (by special admission)
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000
ameltzer@wiley.law

EJ Hurst II (NC Bar No. 39261)
Human Rights Defense Center
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (561) 360-2523
Facsimile: (561) 828-8166
ejhurst@humanrightsdefensecenter.org

Elizabeth Simpson
EMANCIPATE NC
*Local Civil Rule 83.1(d) Counsel*
NC State Bar # 41596
P.O. Box 309
Durham, NC 27702
elizabeth@emancipatenc.org
(919) 682-1149

*Counsel for Plaintiff Human
Rights Defense Center*

August 4, 2023

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     FACTUAL BACKGROUND ................................................................... 3

III.    STANDARD OF REVIEW ..................................................................... 7

IV.     ARGUMENT .......................................................................................... 7

        A.      DEFENDANTS VIOLATED HRDC'S FIRST AMENDMENT
                RIGHTS ........................................................................................ 7

                1.      HRDC Has a Well-Established First Amendment Right to
                        Communicate with Its Prisoner-Subscribers ......................... 8

                2.      Defendants Improperly Impeded HRDC's First Amendment
                        Rights When Defendants Imposed and Enforced a Blanket Ban
                        on HRDC Publications In Certain NCDPS Facilities. ........................ 10

                        i.      The Blanket Bans Were Improper Under *Turner* Factor 1c
                                Because They Were Not Reasonably Related to a
                                Legitimate Government Interest. .................................... 10

                        ii.     The Blanket Bans Were Improper Under the Remaining
                                *Turner* Factors .............................................................. 13

                3.      Defendants Improperly Impeded HRDC's First Amendment
                        Rights When Defendants Withheld Individual HRDC
                        Publications .................................................................................. 14

                        i.      Defendants' Censorship of Individual HRDC Publications
                                Was Improper Under *Turner* Factor 1c Because It Was Not
                                Reasonably Related to a Legitimate Government Interest. .......... 14

                        ii.     Defendant's Censorship of Individual Publications Was
                                Improper Under the Remaining *Turner* Factors .......................... 19

                4.      Defendants Improperly Impeded HRDC's First Amendment
                        Rights When Defendants Failed to Ensure That NCDPS'
                        Policies Were Applied on a Neutral, Non-Discriminatory Basis ........ 20

        B.      Defendants Violated HRDC's Fourteenth Amendment Right to Due
                Process By Failing to Provide Adequate Notice of Withholding
                Decisions and Failing to Provide HRDC a Meaningful Opportunity to
                Challenge the Censorship ........................................................................ 23

1.  **HRDC Has a Constitutional and Policy-Based Right to Due Process**............................................................... 23

2.  **Defendants Failed to Provide Adequate Notice to HRDC When its Publications Were Censored**............................................... 24

3.  **Defendants Failed Meaningfully to Consider and Respond to All But One of HRDC's Numerous Timely Appeals**.......................... 24

V.   **HRDC IS ENTITLED TO A PERMANENT INJUNCTION**................................... 26

VI.  **CONCLUSION** ............................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Beck*,
No. 5:07-CT-3145 (E.D.N.C filed Oct. 26, 2007) ...................................................4

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..............................................................................................7

*Bigelow v. Virginia*,
421 U.S. 809 (1975) ..............................................................................................8

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..............................................................................................7

*Elrod v. Burns*,
427 U.S. 347 (1976) .............................................................................................26

*Human Rights Defense Center v. Southwest Virginia Regional Jail Authority*,
396 F. Supp. 3d 607 (W.D. Va. 2019) ................................................................11

*Human Rights Defense Center v. Sw. Virginia Reg'l Jail Auth.*,
448 F. Supp. 3d 581 (W.D. Va. 2020) ................................................................28

*Jones v. Slade*,
23 F.4th 1124 (9th Cir. 2022) ...................................................................... *passim*

*Legend Night Club v. Miller*,
637 F.3d 291 (4th Cir.2011) ................................................................................27

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .............................................................................................24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ..............................................................................................7

*Miranda v. Garland*,
34 F.4th 338 (4th Cir. 2022) ...............................................................................26

*Montcalm Pub. Corp. v. Beck*,
80 F.3d 105 (4th Cir. 1996), *cert. denied*, 519 U.S. 928 (1996) ....................23, 24

*Prison Legal News v. Northwestern Regional Jail Authority*,
No. 5:15-CV-00061, 2017 WL 4415659 (W.D. Va. Sept. 29, 2017) ....................13

*Prison Legal News v. Ryan*,
  39 F.4th 1121 (9th Cir. 2022) ...............................................................14

*Prison Legal News v. Stolle*,
  319 F. Supp. 3d 830 (E.D. Va. 2015) .......................................... *passim*

*Procunier v. Martinez*,
  416 U.S. 396 (1974), *overruled on other grounds by Thornburgh*, 490 U.S.
  401 (1989).......................................................................................8, 23

*ServFaces GmbH v. Truong*,
  No. 2:19-CV-1906-APG-DJA, 2020 WL 854188 (D. Nev. Feb. 20, 2020)...........................27

*Shaw v. Murphy*,
  532 U.S. 223 (2001)................................................................................9

*TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*,
  920 F.3d 777 (Fed. Cir. 2019)..............................................................27

*Thornburgh v. Abbott*,
  490 U.S. 401 (1989)........................................................... *passim*

*Turner v. Safley*,
  482 U.S. 78 (1987)............................................................... *passim*

*UBS Fin. Servs., Inc. v. Zimmerman*,
  No. 5:16-CV-155-FL, 2017 WL 2963445 (E.D.N.C. July 11, 2017)...................27

*Urbaniak v. Stanley*,
  No. 5:06-CT-3135 (E.D.N.C. filed Dec. 12, 2006) ...............................4

**Statutes**

42 U.S.C. § 1983...........................................................................1, 6

**Other Authorities**

Fed. R. Civ. P. 56............................................................................1, 7

Local Civil Rule 56.1 .......................................................................1

U.S. Const. amend. I .....................................................................1, 8

Plaintiff Human Rights Defense Center ("HRDC") respectfully submits this Memorandum of Law to support its Motion for Summary Judgment ("Motion") under Fed. R. Civ. P. 56.[1] For the following reasons, HRDC is entitled to judgment as a matter of law on its claims for deprivation of its civil rights under 42 U.S.C. § 1983, which arise from the Defendants' improper censorship of HRDC's publications and from Defendants' failure to provide adequate due process.

Accordingly, this Court should: grant HRDC's motion for summary judgment; enter a declaration that Defendants violated HRDC's civil rights; permanently enjoin Defendants from continuing to violate HRDC's rights; award HRDC reasonable attorneys' fees; and grant such further relief as may be just and proper.

## I.    PRELIMINARY STATEMENT

Plaintiff HRDC, a publisher of books and magazines about prisoners' rights and the criminal justice system, has a well-established right under the United States Constitution's First Amendment to communicate with its prisoner-subscribers. *See* U.S. Const. amend.  I; *see also Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (recognizing "legitimate First Amendment interest" of publishers "in access to prisoners").

As with all First Amendment rights, a publisher's right to communicate with prisoners is not absolute. *See generally Thornburgh*, 490 U.S. at 409-13. Any attempt to restrict such speech, however, must be "reasonably related to legitimate penological interests." *Id.* at 404 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Put another way, while prison officials may limit communications with prisoners to advance legitimate penological interests, this does not mean *carte blanche* to regulate any speech disagreeable to prison officials.

---

[1] Plaintiff hereby incorporates its accompanying Statement of Material Facts as if fully set forth herein. *See* Local Civil Rule 56.1(a), (c) ("Memoranda in support of or in opposition to a motion for summary judgment . . . may cross-reference or cite to the statement and appendix prescribed by this Local Civil Rule without repeating the contents thereof"). Plaintiff will reference specific paragraphs from the Statement of Undisputed Material Facts (each a "UMF") as appropriate.

Defendant North Carolina Department of Adult Corrections ("NCDAC")[2] and the individual Defendants—each of whom currently is or previously was employed by NCDPS or NCDAC—impeded HRDC's right to communicate with its prisoner-subscribers by refusing to deliver HRDC's publications to persons incarcerated in North Carolina prison facilities. The undisputed material facts demonstrate that Defendants lacked a legitimate penological interest for denying these publications and, instead, did so because they disagreed with HRDC's point of view. Defendants exacerbated their initial interference with HRDC's rights by failing to adhere to procedures that NCDPS implemented to provide publishers like HRDC with at least the appearance of due process.

*First*, the undisputed material facts prove that Defendants systematically, and without a legitimate penological interest, censored HRDC's publications and, thereby, deprived HRDC of its First Amendment right to communicate with prisoners. This censorship took three forms—each of which independently violated HRDC's civil rights. One involved the blanket denial of HRDC's publications without individual consideration. Defendants included HRDC on a "Master List of Disapproved Publishers." The improper inclusion of HRDC on this list resulted in multiple NCDPS facilities automatically rejecting HRDC's publications without consideration of the content of those publications and without notice to the prisoner-addressee or HRDC. Another form of censorship involved baseless rejection of individual issues of HRDC's publications. Defendant NCDAC has admitted that at least one publication was improperly withheld. Although NCDAC has offered purported post hoc justifications in other instances, these are belied by the similarity of the publications to other material available to prisoners, as confirmed by the candid admissions of the Secretary of NCDAC and other NCDAC employees. The final form of censorship

---

[2] Until December 31, 2022, the North Carolina Department of Public Safety ("NCDPS"), through its Division of Adult Correction and Juvenile Justice, was the state agency that managed the correctional facilities within the State of North Carolina. On January 1, 2023, however, North Carolina's adult correctional system was relocated to a new administrative agency, the Department of Adult Correction ("NCDAC"). On March 31, 2023, the Court granted Defendants' consent motion to substitute NCDAC and its Secretary, Todd Ishee (in his official capacity), for NCDPS and its former Secretary, Erik A. Hooks. ECF No. 63. UMF 7. For the purposes of this Motion, when referring to factual matters involving NCDPS and NCDAC, we refer to the particular entity relevant to the factual statement at issue. When we are discussing the entities' liability, however, we use the phrase "Defendant NCDAC," which, as the acting Defendant, has assumed all responsibility and liability for actions taken by NCDPS.

involved the discriminatory application of NCDPS' policies in a manner that resulted in the disproportionate rejection of HRDC publications without a valid reason.

*Second*, the undisputed material facts prove that Defendants consistently denied HRDC any semblance of due process, and certainly the level of due process required under the law. HRDC timely appealed Defendants' denial of at least 12 HRDC publications. HRDC followed the procedures set forth in NCDPS' policies and the rejection notices sent to HRDC. Nevertheless, Defendants did not even attempt to consider 11 of these appeals, much less provide HRDC with the requisite notice of their disposition. Defendants' failure to provide HRDC with an opportunity to be heard amounted to a denial of HRDC's right to due process.

Defendants' baseless rejection of HRDC's publications and its failure to afford HRDC with any meaningful opportunity to be heard denied HRDC of its constitutionally protected rights to free speech and due process, and HRDC is accordingly entitled to judgment as a matter of law.

## II.    FACTUAL BACKGROUND

*The Parties.*

HRDC is a not-for-profit charitable organization that publishes, *inter alia*, two monthly periodicals—*Prison Legal News* ("PLN") and *Criminal Legal News* ("CLN")—as well as annual reports. UMF 1. PLN and CLN are newsprint publications that primarily contain articles related to the criminal justice system, correctional facilities, court rulings, and individual rights.[3] UMF 2. Each month, HRDC delivers its publications to prisoner-subscribers in the custody of the Federal Bureau of Prisons and the State prison systems in all 50 states. UMF 3-4. As of a September 2021 count, HRDC had 162 prisoner-subscribers to PLN and 70 prisoner-subscribers to CLN within North Carolina's correctional facilities UMF 3.

---

[3] Plaintiff Human Rights Defense Center was previously named Prison Legal News and brought numerous federal lawsuits under that name. When such cases are cited herein, "PLN" refers to the organizational entity, rather than the *Prison Legal News* publication.

NCDPS was the North Carolina state agency responsible for operating the state's prison facilities until January 2023, when those responsibilities were transferred to a new state agency, NCDAC. UMF 7. Each of the individual Defendants was employed by NCDPS during the relevant time period, and Todd Ishee is a Defendant solely in his official capacity as the current Secretary of NCDAC. UMF 125-133.

**The 2010 Publication Policy.**

In 2010, following strikingly similar allegations of censorship of publications directed to prisoners and denial of due process,[4] NCDPS implemented an updated policy governing prisoner receipt of publications pursuant to a Consent Decree entered by this Court ("2010 Publication Policy"). UMF 8-10. Under the 2010 Publication Policy, prisoners at any custody level within NCDPS were generally permitted to receive publications from any legitimate publisher, so long as: (1) the publication came directly from such publisher; and (2) the content of the publication did not violate the Policy. UMF 11-13.

The 2010 Publication Policy was designed, at least on its face, to follow the Supreme Court's guidance in *Thornburgh*. The Policy only allowed NCDPS to withhold publications for content-based reasons if the publication could "be reasonably documented to contain . . . [t]hreats to institutional safety and security" or "which create[d] or reasonably ha[d] the potential to create an articulable threat to the specified objectives." UMF 14. These "threats to institutional safety and security" included "materials which depict, describe or advocate or which include" among other things: "the commission of criminal activity and/or the violation of state or federal laws and/or the violation of the Division of Prisons policy and/or inmate disciplinary policy and procedures" or "violence, disorder, insurrection or terrorist/gang activities against individuals, groups, organizations, the government or any of [its] institutions." UMF 15. Reviewers were expected to use these categories, each of which had a designated "reason code," as guidelines, assessing on a case-by-case basis whether the content of the publication truly posed a threat.[5] UMF 16-18.

---

[4] *See Urbaniak v. Stanley*, No. 5:06-CT-3135 (E.D.N.C. filed Dec. 12, 2006); *Allen v. Beck*, No. 5:07-CT-3145 (E.D.N.C filed Oct. 26, 2007).
[5] *See,* Ishee Dep. Tr. 107:20-25; 108:1-13 (when asked whether a publication that depicted criminal activity should "automatically be withheld" pursuant to Reason Code A, "regardless of the level or type of criminal

Notably, NCDPS was not permitted to reject a publication "solely because its content [was] religious, philosophical, political, social or sexual, or because its content [was] unpopular or repugnant." UMF 19. Moreover, content providing "unbiased reporting of actual news and events"—such as "anything that [a] person might be able to read in a newspaper or see on television as part of the news reporting"— was presumptively permitted. UMF 20-21.

Procedurally, the 2010 Publication Policy provided that publications would be screened initially by mailroom staff within NCDPS' facilities, with the facility head (or designee) having authority to disapprove a publication for receipt by prisoner(s). UMF 22. If the facility head (or designee) determined that a publication should be withheld, he or she was responsible for informing the relevant prisoner and the Publications Review Committee ("PRC").[6] UMF 22-24, 27. The PRC was the committee at the Division-level within NCDPS that was responsible for "conduct[ing] independent reviews of disapproved publications" that had been withheld at the facility-level. UMF 25. The Committee consisted of a Chairperson, Co-Chairperson(s), and members. *Id.* When the PRC voted to withhold a publication, NCDPS was responsible for informing the relevant publisher of its right to submit a written appeal within fifteen days of receipt of the rejection notice. UMF 26. If the publisher timely appealed, NCDPS was required to "notify the publisher of the outcome of the review within fifteen . . . days." *Id.*

The 2010 Publication Policy did not outline any procedures for banning all publications from certain publishers. To the contrary, the Policy explicitly stated that "[i]ndividual review of each issue or

_____

activity[,]" Defendant Ishee testified that "criminal activity is very broad" and that "we expect our staff as corrections professionals to exercise . . . some degree of good discretion"); *see also* Second 30(b)(6) Dep. Tr. 135:12-25; 136:1-3 (when asked whether it was "DPS' position that any content that depicts any type of criminal activity is a threat to institutional safety and security[,]" NCDAC's 30(b)(6) designee testified "in reviewing publication content on a case-by-case basis, that that is a standard that could be used to potentially disapprove a publication. I don't think that it gives blanket authority to disapprove every single publication[.]").
[6] However, if a publication being reviewed was included on the Master List of Disapproved Publications— an NCDPS-wide list identifying the publications that had been withheld in the previous 12 months—there were no appeal rights to challenge the withholding. The facility was, however, still responsible for providing information about the withholding to the PRC.

edition of a publication prior to rejection is required. Rejection of several issues of a subscription publication is not sufficient reason to reject the subscription publication in perpetuity." UMF 27.

### *NCDPS's Unwarranted Rejection of HRDC Publications*

For 33 years, HRDC's publications have been routinely delivered to prisoner-subscribers around the country. To HRDC's knowledge, no disciplinary concerns have ever arisen because of prisoner-subscribers receiving HRDC's publications. UMF 5. Indeed, before January 2019, neither NCDPS nor its predecessor agencies ever (for over almost 29 years) notified HRDC that they were withholding or rejecting an HRDC publication from delivery to a prisoner within North Carolina's correctional facilities due to concerns about institutional safety or security. UMF 6.

Beginning in or around early 2019, however, NCDPS began systematically censoring HRDC's publications both by imposing blanket bans against all of HRDC's publications, and by rejecting individual publications. UMF 31-32, 36-49. Although NCDPS seemingly had a process for publishers like HRDC to contest the rejection of their publications, in most cases, NCDPS simply ignored HRDC's appeals. Specifically, between January 2019 and July 2021, NCDPS notified HRDC that it had withheld at least 20 different publications that HRDC had sent to its prisoner-subscribers. UMF 31. HRDC timely appealed at least 12 of these withholdings by sending written appeals to the address identified in the rejection notices that NCDPS sent to HRDC. UMF 32. NCDPS failed to respond to all but one of the appeals—a systematic failure rate of almost 91%.

HRDC filed the instant action under 42 U.S.C. § 1983 on November 12, 2021, alleging that former-Defendant NCDPS and numerous individual Defendants had adopted and implemented mail policies and practices prohibiting delivery of written speech from HRDC while failing to provide due process. ECF No. 1. On October 17, 2022, HRDC filed a First Amended Complaint ("FAC") that, *inter alia*, added two additional individual defendants. ECF No. 35. On July 28, 2023, HRDC filed a stipulated dismissal of Defendants Casandra Skinner Hoekstra and Doug Pardue. ECF No. 76.

### III.    STANDARD OF REVIEW

A Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion[,]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and can support its factual assertions by "citing to particular parts of materials in the record, . . . or [by] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original). A "genuine" dispute over a material fact does not exist "if the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### IV.    ARGUMENT

Defendants violated HRDC's First Amendment right to communicate with its incarcerated subscribers by censoring HRDC's publications without a legitimate basis. Defendants also violated HRDC's Fourteenth Amendment right to due process by failing to adequately notify HRDC of NCDPS' censorship decisions and by failing to consider all but one of HRDC's timely appeals.

#### A.    DEFENDANTS VIOLATED HRDC'S FIRST AMENDMENT RIGHTS

HRDC, a non-profit publisher, has a long-recognized constitutional right to send its publications to prisoner-subscribers. *See Thornburgh*, 490 U.S. at 408 ("there is no question that publishers who wish to

communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners"). HRDC's right to correspond with its subscribers, incarcerated or otherwise, "is effected only when the [correspondence] is read by the addressee." *Procunier v. Martinez*, 416 U.S. 396, 408 (1974), *overruled on other grounds by Thornburgh*, 490 U.S. 401 (1989). "Both parties to the correspondence have an interest in securing that result, and censorship of the communication between them necessarily impinges on the interest of each." *Id.*

Despite these constitutional protections, the undisputed facts prove that Defendants improperly obstructed HRDC's communications with its prisoner-subscribers in North Carolina in three different ways, each of which independently violated HRDC's First Amendment rights. First, Defendants imposed and enforced—or failed to stop the enforcement of—blanket bans on all publications from HRDC, without regard for their individual content. These blanket bans lacked any reasonable basis and constituted a *per se* violation of HRDC's rights. Second, Defendants improperly withheld certain individual HRDC publications for reasons that Defendants' own employees, including the Secretary of NCDAC, have admitted were not reasonably related to legitimate penological interests. Third, Defendants failed to ensure that the publications review process was applied across all NCDPS facilities in a neutral, non-discriminatory manner.

### 1. HRDC Has a Well-Established First Amendment Right to Communicate with Its Prisoner-Subscribers

The First Amendment prohibits Congress from abridging free speech. U.S. Const. amend. I. The Fourteenth Amendment extends this prohibition to state governments. *E.g.*, *Bigelow v. Virginia*, 421 U.S. 809, 811 (1975) ("The First Amendment, of course, is applicable to the States through the Fourteenth Amendment"). The fact that a communication is between a prisoner and someone on the outside does not eradicate these rights. Indeed, "'[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution', . . . **nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside**.'" *Thornburgh*, 490 U.S. at 407 (quoting *Turner*, 482 U.S. at 84) (emphasis added). Although courts have recognized that prisons may need to

-8-

impose certain restrictions on speech to advance legitimate penological interests, those restrictions are not without limits.

In *Turner v. Safley*, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). Two years later, the Court applied the same standard to prison regulations affecting publishers' rights. *See Thornburgh*, 490 U.S. at 413 ("we now hold that regulations affecting the sending of a 'publication' . . . to a prisoner must be analyzed under the *Turner* reasonableness standard"). This standard applies equally to facial and as-applied challenges. *See id.* at 419 (finding regulations at issue "facially valid under" the *Turner* standard, but remanding to the lower court the issue "of the validity of the regulations as applied to any of the [individual] publications introduced at trial"); *see also Prison Legal News v. Stolle*, 319 F. Supp. 3d 830, 838 (E.D. Va. 2015) ("The *Turner* analysis applies equally to facial and 'as applied' challenges") (citing *Bahrampour v. Lampert*, 356 F.3d 969, 975 (9th Cir. 2004)).

Courts consider four factors in determining whether prison regulations are constitutional: (1) whether there exists "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it[;]" (2) "whether there are alternative means of exercising the right that remain open[;]" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally[;]" and (4) "the absence of ready alternatives." *Turner*, 482 U.S. at 89-90 (internal citations and quotation marks excluded). The first *Turner* factor is divided further into three distinct sub-factors: the asserted government interest purporting to justify the regulation must be "(1) legitimate ["*Turner* Factor 1a"] and (2) neutral ["*Turner* Factor 1b"]," and the regulation itself must be (3) "'rationally related to that objective ["*Turner* Factor 1c"].'" *See Jones v. Slade*, 23 F.4th 1124, 1135 (9th Cir. 2022) (quoting *Thornburgh*, 490 U.S. at 414). The first *Turner* factor is appropriately considered a threshold issue because "[i]f the connection between the regulation and the asserted goal is 'arbitrary or irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor." *Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001) (quoting *Turner*, U.S. at 90).

HRDC does not dispute, for purposes of this Motion, that Defendants have a legitimate interest in

ensuring the safety and security of NCDAC's facilities and all those within them. Thus, *Turner* Factor 1a is not at issue. A legitimate interest does not, however, give Defendants *carte blanche* to censor any publication—including those that may be critical of prisons or the prison system—under a pretext of prison security. *See Jones*, 23 F.4th at 1138 (*"*[W]hether exclusions are in fact based on the prison's asserted interest 'go[es] to the adequacy of the regulations as applied'"*) (citing *Thornburgh*, 490 U.S. at 417 n.15).

Because Defendants applied the 2010 Publication Policy in ways not rationally related to that legitimate interest, and in a non-neutral manner, Defendants' restrictions on HRDC's speech do not pass First Amendment muster.

### 2. Defendants Improperly Impeded HRDC's First Amendment Rights When Defendants Imposed and Enforced a Blanket Ban on HRDC Publications In Certain NCDPS Facilities.

Defendants violated HRDC's First Amendment rights and NCDPS' own policies when censoring HRDC's publications without any individualized consideration of the government interest advanced by such censorship. On at least five occasions between December 9, 2020 and May 22, 2022, numerous NCDPS correctional facilities implemented blanket bans on all of HRDC's publications, censoring everything HRDC published without performing individualized assessments of the publications. These blanket bans were not based on any purported or articulated threat posed by any publication in particular. Rather, NCDPS censored HRDC's publications solely because they originated from HRDC.

  i.     The Blanket Bans Were Improper Under *Turner* Factor 1c Because They Were Not Reasonably Related to a Legitimate Government Interest.

The blanket bans against HRDC were not based on whether the content of HRDC's publications posed a threat to NCDPS' facilities. These bans therefore could not have been rationally related to any legitimate government interest, and thus violate *Turner* Factor 1c.

In *Thornburgh*, the Supreme Court recognized the importance of requiring **individualized assessments** of every publication, and "expressly reject[ed] certain shortcuts that would [have led] to needless exclusions . . . [such as a] prohibition against establishing an excluded list of publications[.]" *Thornburgh*, 490 U.S. at 4117. The Court emphasized that it was "comforted by the **individualized**

**nature** of the determinations required by the regulation." *Id.* at 416 (emphasis added); *cf. Human Rights Defense Center v. Southwest Virginia Regional Jail Authority*, 396 F. Supp. 3d 607, 620, 624 (W.D. Va. 2019) (granting HRDC's motion for summary judgment on First Amendment claims in part because blanket bans against unapproved books and magazines was not rationally related to any legitimate interest).

Moreover, NCDPS' own policies expressly mandated individualized assessments of every publication. UMF 27. Facility-level reviewers were required to "approve or disapprove publications . . . on a case-by-case and/or an issue-by-issue basis." *Id.* The Policy also prohibited the wholesale censorship of periodicals—such as PLN and CLN—even where prior issues of the publications had been withheld. *Id.* ("Rejection of several issues of a subscription publication is not sufficient reason to reject the subscription publication in perpetuity"). In addition, nothing in the 2010 Publication Policy permitted NCDPS to ban certain publishers.[7]

Despite the constitutional and policy-based requirement that reviewers conduct individualized assessments of every publication, numerous NCDPS facilities implemented blanket bans against HRDC's publications. On or about October 21, 2020, HRDC was added to the Master List of Disapproved Publication[s] ("Master List"). *See* UMF 46-48. Because HRDC was on this Master List, it was considered "not [an] approved publisher" and NCDPS' facilities were expected automatically to reject any publication from HRDC. *See* UMF 44. Once placed on the Master List, HRDC would remain there in perpetuity. UMF 49. Defendants are unable to justify HRDC's inclusion on this Master List; indeed, Defendant NCDAC conceded that HRDC should not have been placed on the Master List and that "it cannot be determined who entered this information on the Master List, when it was entered, or whether HRDC was notified." UMF 50. Although Defendant NCDAC now admits that HRDC should not have been added to the Master List, this does not rectify the fact that between approximately December 9, 2020 and May 31, 2022, numerous

---

[7] By contrast, when NCDPS amended the policy on August 23, 2022, it outlined standards for barring publishers in certain limited circumstances not applicable here (where publications repeatedly contain contraband). UMF 124.

facilities within NCDPS prohibited prisoners from receiving publications from HRDC and the Defendants failed to stop these bans:

- On or about December 9, 2020, an NCDPS prisoner was informed by facility personnel that he was unable to receive his HRDC publication because "[t]he source of [the prisoner's] publication/material appears on the statewide Master List of Disapproved Publication Source because this source was disapproved during the previous twelve (12) months by the Division of Prisons Publication Review Committee." UMF 54. The prisoner was further advised that he had no opportunity to appeal this withholding. *See id.* (showing HRDC on a "Master List of Disapproved Publishers").

- On or about January 28, 2021, a Warden informed the prisoner population at Craggy Correctional Center that "effective immediately, offenders who seek to order any books, or other written materials are required to gain approval from the Unit Captain before ordering[,]" **that only Amazon and Hamilton Books were authorized vendors**, and that "[a]ny deviation from this written directive will result in a disapproval." UMF 55. When NCDAC's 30(b)(6) designee, Joshua Panter, was asked about this letter, he acknowledged that nothing in the 2010 Publication Policy prohibited offenders from ordering publications from any legitimate publisher. UMF 56.

- On or about January 14, 2022, prisoners at NCDPS' Piedmont Correctional Institution received multiple notification forms advising them that HRDC was on "the Division of Prisons Master List of Disapproved Publication Source List" and that they had no appeal rights. UMF 36.

- On or about April 21, 2022, a prisoner at NCDPS' Marion Correctional Institution submitted a request to receive a four-year subscription to both PLN and CLN. UMF 37. On or about April 28, 2022, the prisoner's request was denied because "[t]his company is on the Disapproved Publication List." UMF 38.

- On or about April 28, 2022, multiple prisoners at NCDPS' Pender Correctional Institution were notified that HRDC was on "the Division of Prisons Master List of Disapproved Publication Source List" and that they had no appeal rights. UMF 39.

- On or about May 31, 2022, a different prisoner at NCDPS' Pender Correctional Institution was notified that HRDC was on "the Division of Prisons Master List of Disapproved Publication Source List" and that he had no right to appeal the withholding. UMF 40.

NCDPS failed to stop the enforcement of these blanket bans even after their unconstitutionality was brought to its attention by an astute prisoner. Specifically, after the prisoner referenced above, who received a letter from Pender Correctional Institution on May 31, 2022, was informed he could not receive his HRDC publication, he filed a grievance noting that "NC DPS-Prison's Master List Of Disapproved Publishers recently banned [HRDC] which means all books distributed by them, all books published by them, and all magazines published by them are now disapproved regardless of these publications' content." UMF 41. The prisoner also clearly and accurately identified the legal bases under which such blanket ban was prohibited, noting that the ban "not only violates NC DPS-Prison Policy on Publications but will not

pass federal constitutional muster under Turner v. Safley (U.S. 1987)." *Id.* NCDPS, for its part, summarily dismissed the grievance, finding—without justification—that "examination of this grievance reveal[ed] no violation of applicable Prisons policy." UMF 42. This response flies in the face of the 2010 Publication Policy, which explicitly prohibited the wholesale banning of entire publishers. UMF 28-29. NCDPS' failure to recognize the improper implementation of its Policy demonstrates not only the abject failure of NCDPS' grievance process, but also an utter disregard for the First Amendment rights of HRDC and its prisoner-subscribers.

By enforcing or failing to stop the enforcement of numerous blanket bans against HRDC's publications, Defendants systematically censored HRDC without considering the content of the publication. In other words, the blanket bans were not even purported to be related to any legitimate governmental interest, and therefore fail under *Turner* Factor 1c.

  ii. The Blanket Bans Were Improper Under the Remaining *Turner* Factors

Although the failure of the blanket bans under *Turner* Factor 1 is dispositive, Defendants' imposition of blanket bans against HRDC also tilt the remaining *Turner* factors heavily in HRDC's favor.

*Turner* Factor 2 requires courts to consider the alternative means HRDC and its prisoner-subscribers have of exercising their right to communicate. *Cf. Turner*, 482 U.S. at 90. In *Prison Legal News v. Northwestern Regional Jail Authority*, the court found that this factor clearly favored PLN where, as here, the policy "was effectively a complete ban on any prisoner being able to obtain PLN publications[.]" No. 5:15-CV-00061, 2017 WL 4415659, at *6 (W.D. Va. Sept. 29, 2017) [hereinafter, "*Northwestern*"]. Because Defendants did not provide any alternative means for HRDC to communicate with prisoners, *Turner* Factor 2 weighs strongly in favor of HRDC.

The third *Turner* factor also weighs in favor of HRDC. This factor requires courts to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. In this case, this third factor dovetails with the fourth factor, which requires courts to consider whether there are "ready alternatives" to a regulation. *Id.* Defendant NCDAC conceded that HRDC should not have been added to a Master List, and

nothing in the 2010 Publication Policy permitted individual facilities to ban entire publishers. UMF 28, 50. Defendants' imposition of blanket bans against HRDC thus violated NCDPS' own policies. By entering into the Consent Decree that resulted in the 2010 Publication Policy, Defendants acknowledged the feasibility of implementing less restrictive procedures. By their own admission, Defendants simply failed to do so.

### 3. Defendants Improperly Impeded HRDC's First Amendment Rights When Defendants Withheld Individual HRDC Publications

Defendants violated HRDC's First Amendment rights and NCDPS' own policies when, without a valid basis for doing so, they censored numerous individual HRDC publications. Each instance of censorship constitutes an independent violation of HRDC's constitutional rights. Collectively, Defendants' actions reflect a systematic effort to censor speech that Defendants found distasteful. This censorship did not advance any legitimate penological interest. Moreover, by rejecting *entire* HRDC publications for minor proclaimed concerns, Defendants failed to provide HRDC with alternative means of communication.

> i. Defendants' Censorship of Individual HRDC Publications Was Improper Under *Turner* Factor 1c Because It Was Not Reasonably Related to a Legitimate Government Interest.

Defendants' repeated rejection of HRDC's publications based on the content of the news articles they contained was not rationally related to any legitimate penological interest and cannot pass muster under *Turner* Factor 1c. In its rejection notices, NCDPS frequently provided only cursory explanations that failed to even identify the material at issue, much less explain how the material threatened prison safety. For example, NCDPS rejected the September 2020 issue of *PLN* on the basis that page 19 "[c]ontains anti-racism articles." UMF 60. In several instances, Defendants have admitted that censored HRDC publications should not have been withheld from prisoners, undermining any argument that such withholding was rationally related to any government interest. *Cf. Prison Legal News v. Ryan*, 39 F.4th 1121, 1136-37 (9th Cir. 2022) (where the defendant correctional agency redacted content that did not fit within the scope of its publication policy, such withholding could not "have been rationally related to the Department's legitimate penological goals"); *see also Prison Legal News v. Stolle*, 319 F. Supp. 3d 830, 846, 848 (E.D. Va. 2015)

(in granting PLN's motion for summary judgment as a specific prior publications-related policy, the court found that first *Turner* factor "strongly favor[ed] PLN" because there was "no obvious rational connection between the broad former policy and valid penological goals such as institutional safety and security"). In addition, many of the pages from HRDC's publications that were cited as being problematic did not violate the 2010 Publication Policy or are so innocuous that no reasonable jury could find that the withholding of them was rationally related to any legitimate interest.

Examples of the improperly censored publications are provided below:

| Publication | Article Identified for Censorship | Purported Basis for Censorship | Reasons Censorship Was Improper |
|---|---|---|---|
| September 2020 PLN (Vol. 31, No. 8) | The first partial article on page 19 discusses how isolation due to the COVID-19 pandemic impacts prisoners. UMF 58. The second article discusses the alleged disparate censorship of publications related to Black culture. UMF 59. | Reason D: "Page Number(s): 19 . . . contains anti-racism articles." UMF 60. | Defendant NCDAC conceded that this publication should not have been withheld from prisoners. UMF 61. In addition, when Defendant Hardy—who had reviewed this publication and voted to censor it—was asked why she voted to withhold this publication, she testified "I don't know why I agreed with that one." UMF 62. |
| December 2020 CLN (Vol. 3, No. 12) | The first article on page 24 explains what CLN is and the topics it covers. The second article discusses a report from the National Registry of Exonerations which detailed types of prosecutorial and police misconduct in cases where the accused was exonerated. UMF 65. | First Rejection Notification—Reason D: "Page Number(s): 24 . . . Depicts article on police corruption, may incite violence[.]" UMF 66  Second Rejection Notification—Reason D: "Page Number(s): 24 . . . Violence, disorder, insurrection[.]" UMF 67. | The mere description of misconduct does not justify censorship. Indeed, when Defendant Carter—who had reviewed this publication and voted to censor it—was asked why she voted to withhold this publication, she testified that she did not "see a reason" why she would have rejected it. UMF 69. |
| December 2018 PLN (Vol. 29, No. 12) | Pages 1 and 3-4 discuss generally the restrictions on the receipt of publications by prisoners and refer to multiple lawsuits filed by HRDC against prisons/jails related to censorship (including a case against jails in | Reason A: "Page Number(s): 1, 2, 3, 4 . . . Detail illegal activities against prison staff." UMF 74.  Defendant NCDAC testified that the threat posed by the content in this publication is that "[law]suits against the DPS or against a correctional | First, nothing in the 2010 Publication Policy permits the withholding of content simply because the reviewer believes the content is inaccurate or includes unproven allegations. To the contrary, the 2010 Publication Policy explicitly provides that "[a] publication may not be |

| Publication | Article Identified for Censorship | Purported Basis for Censorship | Reasons Censorship Was Improper |
|---|---|---|---|
| | North Carolina). UMF 72. Page 2 discusses contribution and gift options, and also describes three litigation actions filed by HRDC. UMF 73. | agency could work to undermine the authority that the agency has and eventually cause harm through the loss of authority, the loss of legitimacy of that agency as an authority figure in their facilities." UMF 75. When asked to identify content on page 4 that was problematic, Defendant Tharrington testified, "There's a paragraph in the middle column that says, 'Unfortunately, there seems to be no end to arbitrary and unjustified censorship by prisons and jails, which means there will be no end to litigation around that issue.' That's a very broad statement and including a lot of agencies. And it makes -- it would make the casual reader think that there's just this massive conspiracy amongst all correctional agencies to deprive offenders of reading materials. And that is not the case." UMF 76. | rejected solely because its content is . . . unpopular or repugnant." UMF 19. Second, no rational jury could find that an article discussing legal lawsuits against correctional agencies poses a threat to institutional safety and security. Even Defendant Ishee, the Secretary of NCDAC, admitted that nothing on these pages would pose a threat to institutional safety and security. UMF 77. |
| 2019 Annual Report | The first article on page 23 discusses HRDC's efforts to reduce "the cost of phone calls between prisoners and their family members." UMF 79. The second article on page 23 discusses HRDC's efforts to combat government agencies and private companies from profiting from the prison industry. UMF 80. | Reason D: "Page Number(s): 23, 32 . . . Depict articles that could cause work stoppage/violence[.]" UMF 81<br><br>Defendant NCDAC explained that "[t]he precise language that caused NCDPS to reject the 2019 Annual Report is that Page 23 states, 'HRDC's Stop Prison Profiteering campaign focuses on the ongoing financial exploitation of prisoners and their families by both government agencies and private companies that | As a matter of law, no rational jury can find that these articles pose a threat to institutional safety and security. These articles "provide unbiased reporting of actual news and events" and therefore should have been permitted in accordance with the 2010 Publication Policy. UMF 20. Defendant Ishee admitted that the "Stop Prison Profiteering" article "could be safely allowed" in the prison facilities. UMF 84-85. |

| Publication | Article Identified for Censorship | Purported Basis for Censorship | Reasons Censorship Was Improper |
|---|---|---|---|
| | | provide prison and jail related services. Suc[h] exploitation includes the egregious cost of video calling, commissary items, money transfers, and secure email and tablet services, as well as the growing practice of releasing prisoners with fee-laden debit cards. Compounding these practices are monopoly contracts between corrections agencies and private companies, which are frequently awarded in exchange for 'commission kickbacks.'" UMF 82. Defendant NCDAC testified that "[t]his verbiage can encourage activities that may lead to the use of physical violence or group disruption." *Id.* Defendant Bleeker also testified the "Stop Prison Profiteering" article could cause work stoppages because "the inmates weren't getting paid appropriately." UMF 83. | |
| June 2020 PLN (Vol. 31, No. 6) | The article on page 22 describes generally the divergent ways prison officials and prisoners have portrayed the impact of the COVID-19 pandemic on prison facilities and includes a prisoner letter describing his/her experience at a facility. UMF 87. The first portion of page 31 describes various countries' use of mass amnesty programs to release prisoners; the second article discusses how Alabama was planning to use a | Reason D: "Page Number(s): 22, 31, 38 . . . Material may lead to disorder during Covid-19 event[.]" UMF 91.

Defendant NCDAC explained that this publication was withheld because the discussion of COVID-19-related issues in correctional facilities "can encourage activities that may lead to the use of physical violence or group disruption." UMF 92. Defendant Kendall also explained that he voted to disapprove this publication because of concerns over the COVID-19-related | As Defendant Ishee admitted, nothing on the pages identified were "any . . . more inflammatory than . . . the hundreds of thousands of pandemic related coverages that we all saw as we lived through the pandemic." UMF 95. Defendants' censorship of HRDC's publication—without censoring every publication containing similar content (in print form or on prisoner tablets)—evidences the disparate, discriminatory way that HRDC's publications were treated and "the unequal application of the policy defeats the rational relationship between the |

| Publication | Article Identified for Censorship | Purported Basis for Censorship | Reasons Censorship Was Improper |
|---|---|---|---|
| | previously closed facility to quarantine new prisoners. UMF 88-89. The article on page 38 discusses rates of COVID-19 within prison facilities and potential underreporting of cases by prisons and describes certain facilities' lack of responsiveness to PLN's requests for information on what the facility was doing to protect prisoners. UMF 90. | information available to prisoners. UMF 94. | policy and the government's asserted justification." *Jones*, 23 F.4th at 1137.[8] |
| April 2021 PLN (Vol. 32, No. 4) | The first article on page 28 discusses the firing of two jail officials after a woman with mental health issues was ignored by jail staff while in labor and ultimately had to give birth in her cell. UMF 97. The second article discusses public sentiment regarding holding law enforcement officers individually accountable for instances of brutality, including a discussion of how U.S. detention facilities do not allow holiday cards because some of the material in the cards can be used to smuggle narcotics. UMF 98-99. | Reason H: "Page Number(s): 28 . . . Article incites unrest[.]" UMF 100.

Defendant Dunston could not recall why he rejected this publication. When asked whether anything appeared problematic to him at the time of the deposition based on his prior experience as a member of the PRC, Defendant Dunston said, "[t]he only thing that sticks out to me was them referencing the 2020 killing of George Floyd and talking about a lot of the misconduct of staff and things of that nature during that time frame, but that was one of those volatile time frames that – in our nation." UMF 101. | The article in no way encourages or advocates violence. UMF 97. Rather, the author writes that law enforcement's request for calm and individual accountability of responsible officers was "[a] very reasonable request." UMF 97. The informative portions of this publication constitute "unbiased reporting of actual news and events[,]" which the 2010 Publication Policy provided should "not normally [be] withheld." UMF 20. More, no reasonable jury could find that the article "depict[ed], describe[ed,] or advocated[,] or . . . include[d] . . . violence against any ethnic, racial or religious group or which reasonably appear[ed] likely to provoke or to precipitate a violent confrontation between the recipient or recipients or any other inmate in possession of |

---

[8] The disparate treatment of HRDC's publications versus similar types of publications is discussed in detail in Section A.4.

| Publication | Article Identified for Censorship | Purported Basis for Censorship | Reasons Censorship Was Improper |
|---|---|---|---|
| | | | same and a member or members of the target group[,]" which was the Reason Code provided on the rejection form. UMF 102. |

Even a cursory review of several of these examples demonstrates that Defendants' justifications lacked credibility and Defendants frequently used institutional security as a pretext to exclude content that "paints correctional officers in a bad light." UMF 70. Not only did nothing in the 2010 Publication Policy permit the automatic withholding of publications simply because content contained therein was derogatory against prisons, but the Policy specifically prohibited the rejection of a publication "because its content is unpopular or repugnant." UMF 19. It also provided that "[p]ublications that provide unbiased reporting of actual news and events are not normally withheld." UMF 20. Defendants' pretextual justifications (*e.g.,* that any content that was "derogatory against prisons[, or] prison policies" posed a "security risk,") cannot stand. UMF 103. Although regulations in correctional facilities are afforded "a deferential standard of review[,]" this deference is not boundless, and "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Jones*, 23 F.4th at 1134 (internal quotation marks and citations omitted).

Defendants' failure to justify the withholding of several publications conclusively demonstrates that their rejection was not reasonably related to a legitimate penological interest. In other cases, Defendants' justifications were so dubious that the Court can determine as a matter of law that they were merely pretextual.

        ii.    Defendant's Censorship of Individual Publications Was Improper Under the Remaining *Turner* Factors

Although the failure of Defendants' censorship under *Turner* Factor 1 is dispositive, the remaining *Turner* factors also weigh in favor of HRDC.

As to *Turner* factor 2, when NCDPS or its employees censored publications for content-based purposes, they did so by withholding the entire publication—there was, as a matter of policy, "no attempt to remove or censor the disapproved material." UMF 30. There was, therefore, no alternative means for HRDC to share its content with its subscribers (or, for that matter, for subscribers to receive HRDC's content).

The third *Turner* factor also weighs in favor of HRDC. This factor requires courts to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. As with the analysis of Defendants' blanket bans against HRDC's publications, here too the third factor dovetails with the fourth factor, which requires an analysis of alternatives to the regulation under review. *Id.* Any suggestion that routinely distributing HRDC's publications in North Carolina's prisons would have a detrimental effect on guards is belied by the fact that, until in or around early 2019, NCDPS never withheld HRDC's publications due to concerns about institutional safety or security. UMF 6. Only recently did NCDPS begin systematically withholding HRDC's publications as part of an "exaggerated response to prison concerns." *Turner*, 4892 U.S. at 90 (internal quotation marks omitted). Defendant's prior application of its policies in a less restrictive matter demonstrates that the third and fourth *Turner* factors weigh in HRDC's favor. *See Stolle*, 319 F. Supp. at 847 (third and fourth factors favor PLN in part because defendants voluntarily chose to adopt less restrictive policy, and because "the desired accommodation sought by PLN [wa]s not to force a new policy on [d]efendants, but to preclude them from returning to the prior overbroad policy") (internal quotation marks omitted).

### 4. Defendants Improperly Impeded HRDC's First Amendment Rights When Defendants Failed to Ensure That NCDPS' Policies Were Applied on a Neutral, Non-Discriminatory Basis

If there was any doubt that Defendants' censorship of HRDC's publications was unconstitutional, that doubt is erased when considering the discriminatory manner in which NCDPS implemented its policies. A facially valid prison regulation is still unconstitutional if applied in a non-neutral, discriminatory manner. *See Turner*, 482 U.S. at 90 ("We have found it important to inquire whether prison regulations restricting

-20-

inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression"); *cf. Thornburgh*, 490 U.S. at 417 n.15 (respondents' arguments "that variability in enforcement of the regulations stem[med] solely from the censors' subjective views" went to "the adequacy of the regulations as applied, and [would] be considered on remand"). Although "*Turner* neutrality is not the 'content neutrality' [courts] demand in other areas of First Amendment jurisprudence[,]" it is not toothless. *See Jones*, 23 F.4th at 1136 (citations omitted). There is a recognized distinction between permissible regulation and unconstitutional, discriminatory censorship, and Defendants have systematically applied the latter.

To determine whether a regulation is applied neutrally, courts consider whether similar content is treated differently. In *Jones v. Slade*, a prisoner challenged a correctional agency's withholding of certain CDs from him, arguing, *inter alia*, that the agency's publications-related policies were not applied neutrally. 23 F.4th at 1132, 1134. The Ninth Circuit explained that the purpose of the *Turner* neutrality requirement is to "ensure[] that the prison's application of its policy is actually based on the justifications it purports, and not something more nefarious." *Id.* at 1136 (citing *Mayfield v. Tex. Dep't of Crim. Just.*, 529 F.3d 599, 609 (5th Cir. 2008)). In remanding to the district court, the Ninth Circuit found that the plaintiff had "proffered sufficient evidence of inconsistent application of [the policy] to preclude summary judgment" for the defendants, including evidence that the agency "*affirmatively provide[d]* inmates access to books, music, and television programs that plainly violate" the applicable publication policy. *Id.* at 1137-38 (emphasis in original). The court emphasized that this provision to prisoners of "access to the type of content [the agency] claims is detrimental to institutional security and the goals of rehabilitation, calls into question the rational relationship between [the policy and the agency's] legitimate penological interests and the reasonableness of the policy." *Id.* at 1138 (internal quotation marks omitted).

While Defendants closely scrutinized every word of HRDC's publications for content that could, even in the most attenuated circumstances, affect prison security, they failed to provide this same scrutiny to other publications that covered equally charged topics. For example, when NCDAC was asked why the December 2020 issue of CLN was censored, NCDAC explained that "Page 24 depicted a detailed report on

wrongful convictions that involved misconduct by police and prosecutors. This article can encourage activities that may lead to the use of physical violence or group disruption." UMF 68. Yet, NCDPS provided prisoners with regular, uncensored access to newspapers that routinely cover issues such as police and prosecutorial misconduct. Indeed, numerous NCDPS/NCDAC facilities have newspaper subscriptions for their libraries, and Defendant Carter explained that local newspapers were "automatically approved" to be disseminated in NCDPS' facilities, with only items such as the internal fliers and coupons being screened and removed. UMF 105, UMF 107; *see also* UMF 109 (explaining that when he worked in one of NCDPS' correctional facilities, "every morning, two big stacks of News & Observers would . . . be distributed to all of the housing areas for the inmates. . . . in an unscreened manner").

Defendants apply even less scrutiny to news-related content that prisoners can access via electronic tablets. Beginning in or around May 26, 2020, NCDPS began providing prisoners with electronic tablets that contained a variety of content, including the news, books (including *Hamlet* and *Les Misérable*), and movies (including the *Mission Impossible*, *Oceans*, and *Bourne* movies as well as *White House Down* and *Olympus Has Fallen*). UMF 111. As to the news-related content in particular, prisoners could access, *inter alia*, Fox News, BBC, E! Online, Fortune, Vice, and TMZ. UMF 111-112. Defendant NCDAC has admitted that these news-related services "provide[] the same content as provided to [the] General Public." UMF 112.

Defendants also provide many of the prisoners in its facilities with generally unmonitored access to television news channels. NCDPS' initial 30(b)(6) designee, referencing a recent protest at one of NCDPS' own facilities, acknowledged that "obviously our offenders were able to see that on television as it kind of was broadcasted." UMF 113; *see also* UMF 115 (Defendant Hardy, who was a Warden at an NCDAC correctional facility at the time of her deposition, testified that the prisoners in her facility are permitted to watch the local news channels, and that none of her staff monitors those channels). Defendant NCDAC admitted that if content is "something that's well known, **if it's public news and something that offenders can see [on] television, that shouldn't be something that's stopped through publication.**" UMF 115 (emphasis added).

The undisputed evidence shows that Defendants have been so wildly inconsistent with regard to the content permitted within North Carolina's correctional facilities that there is no genuine dispute that Defendants "selectively enforce[] [the 2010 Publication Policy] against disfavored expression[,]" specifically, HRDC. *Jones*, 23 F.4th at 1139. This is exactly the type of disparate treatment of publications that the *Jones* Court identified as potentially unconstitutional.

Defendants' "unequal application of the [P]olicy defeat[ed] the rational relationship between the [P]olicy and the government's asserted justification" for it, thus rendering it unconstitutional as applied. *Jones*, 23 F.4th at 1137. Allowing Defendants to apply vastly different standards of review to similarly situated publications would allow them "to justify a policy based on a legitimate interest applicable to the overall prison population, while applying the policy in an arbitrary or discriminatory manner in violation of a particular subgroup's [HRDC's] First Amendment rights." *Jones*, 23 F.4th at 1136 (internal quotation mark and citations omitted).

**B.      Defendants Violated HRDC's Fourteenth Amendment Right to Due Process By Failing to Provide Adequate Notice of Withholding Decisions and Failing to Provide HRDC a Meaningful Opportunity to Challenge the Censorship**

The undisputed facts demonstrate that Defendants repeatedly failed to provide HRDC with adequate notice that its publications were being censored and to meaningfully consider HRDC's appeals, all in violation of HRDC's constitutional and Policy-based rights to due process.

### 1.      HRDC Has a Constitutional and Policy-Based Right to Due Process

HRDC's interest in corresponding with prisoner-subscribers, "grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment. . . . As such, it is protected from arbitrary governmental invasion." *Procunier*, 416 U.S. at 418. The Fourth Circuit has held "that publishers are entitled to [(1)] notice and an [(2)] opportunity to be heard when [its] publications are disapproved for receipt by inmate subscribers." *Montcalm Pub. Corp. v. Beck*, 80 F.3d 105, 106 (4th Cir. 1996), *cert. denied*, 519 U.S. 928 (1996). HRDC was also entitled to due process pursuant to the 2010 Publication Policy, which required NCDPS to notify a publisher that its publication had been withheld and provide that publisher with an opportunity to appeal. Defendants have repeatedly failed under both the

Fourteenth Amendment and the 2010 Publication Policy to provide HRDC with the procedural process it is due when censoring HRDC's publications.

### 2. Defendants Failed to Provide Adequate Notice to HRDC When its Publications Were Censored

Defendants did not provide any notice to HRDC when Defendants added HRDC to a banned publishers list or when they withheld publications from prisoners based on HRDC's inclusion on this list. The undisputed facts show that beginning on or around October 2021, HRDC was placed on a Master List, banning its publications from all facilities within NCDPS. *See supra* Section A.2.i. Even if it was proper to add HRDC to such a list (which, as discussed, *supra*, it was not), there is no dispute that NCDPS should have notified HRDC when placing HRDC on the list. UMF 51. It did not. UMF 52. HRDC only learned of its placement on the Master List from a prisoner. UMF 53. "[W]hile the inmate is free to notify the publisher and ask for help in challenging the prison authorities' decision, the publisher's First Amendment right must not depend on that." *Montcalm*, 80 F.3d 105 at 109.

Regardless of why HRDC was placed on the Master List or why certain facilities barred all publications from it, HRDC was entitled—under the Fourteenth Amendment and the 2010 Publication Policy—to be notified by NCDPS that its publications were being withheld. Because Defendants failed to provide such notice, HRDC is entitled to summary judgment on its Due Process claim. *See Stolle*, 319 F.Supp. 3d at 850, 852 n.20, 854 (granting PLN's motion for summary judgment on its due process claims because defendants failed to notify PLN when it withheld two or three of its publications).

### 3. Defendants Failed Meaningfully to Consider and Respond to All But One of HRDC's Numerous Timely Appeals

In several additional instances, Defendants notified HRDC that an individual publication had been withheld, but then failed to consider HRDC's appeals. Defendants' near-total failure to review and respond to HRDC's appeals violates the 2010 Publication Policy and falls woefully short of "[t]he fundamental requirement of due process[,] . . . the opportunity to be heard . . . **in a meaningful manner**." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (emphasis added) (quotation marks and citation omitted).

The undisputed facts establish that NCDPS routinely failed to respond to HRDC's timely appeals

of Defendant's censorship decisions. Former-Defendant NCDPS admitted that HRDC submitted timely appeals of the following publications: February 2020 PLN; April 2020 PLN, June 2020 PLN, September 2020 PLN, September 2020 CLN, October 2020 PLN, November 2020 PLN, December 2020 CLN; January 2021 CLN; April 2021 PLN; May 2021 PLN; and June 2021 PLN. UMF 32. As to each of these appeals— with the exception of the appeal of the December 2020 issue of CLN—former-Defendant NCDPS also admitted that it failed formally to review the appeal, failed to reconsider the decisions to withhold the publications, and failed to respond to HRDC. UMF 33-35.

Under the 2010 Publication Policy, a publisher wishing to appeal a withholding decision was permitted to "submit" a written appeal "as advised in the rejection notice, . . . within fifteen . . . days of receipt of the written notification from the [PRC] that the publication was disapproved." UMF 26. All of the rejection notices received also informed HRDC that it could "obtain an independent review of this decision by writing within fifteen (15) days of receipt of this letter to" a specified address associated with NCDPS. UMF 116. Defendant NCDAC admitted that "it would be inconsistent with policy if we received an appeal [from a publisher] and we willingly did not respond to it." UMF 117. Yet that is exactly what happened here.

The only time HRDC received a response to one of its appeals, the response letter indicated that the appeal had been considered by the Correspondence Review Committee, which is an entirely different committee than the PRC and was not responsible for reviewing publisher appeals. *See, e.g.*, UMF 119; *see also* UMF 120 (acknowledging that it would not be consistent with the Policy for the Correspondence Review Committee to review a publisher appeal of a withheld publication). Moreover, the letter was purportedly sent to HRDC by Defendant Garry Bleeker; however, the letter was not signed, and when Defendant Bleeker was deposed, he testified that that he did not believe he had drafted the letter, and that he "would have remembered receiving something from [HRDC]." UMF 122.

Defendants have not offered any explanation for their failure to properly consider all of the appeals that HRDC timely submitted. By failing to adhere to the process it had established for publishers to contest its censorship decisions, NCDPS denied HRDC a meaningful opportunity to be heard in violation of its due

process rights under the Fourteenth Amendment.

## V.      HRDC IS ENTITLED TO A PERMANENT INJUNCTION

Prospective injunctive relief in the form of the injunction contained in HRDC's Motion is necessary to at least partially remedy Defendants' prior constitutional violations and enjoin any such future violations. *See Stolle*, 319 F.Supp. 3d at 848 (granting injunction in PLN's favor to "preclud[e] Defendants from returning to a specific prior policy that [was] no longer in force and ha[d] been found to be unconstitutional"). Courts consider four factors when determining whether injunctive relief is appropriate: 1) Defendants' actions have caused irreparable injury to HRDC; 2) legal remedies will not adequately compensate HRDC for the injuries caused by Defendants; 3) the balance of hardships between HRDC and Defendants warrant equitable relief; and 4) the public interest will not be disserved by a permanent injunction against Defendants. *See, e.g.*, *Stolle*, 319 F. Supp. 3d at 848 n.15 (citing *Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir.2011)). The undisputed material facts show that HRDC can satisfy each of the four factors.

As to the first factor, the undisputed facts demonstrate that Defendants repeatedly violated HRDC's First Amendment right to communicate with its prisoner-subscribers by enforcing blanket bans against HRDC, improperly withholding certain individual HRDC publications, and applying the 2010 Publication Policy in a non-neutral manner in an effort to censor HRDC's content. These violations of HRDC's First Amendment rights irreparably harmed HRDC, because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The undisputed facts also demonstrate that Defendants repeatedly violated HRDC's constitutional right to due process by failing to provide it with adequate notice of Defendants' censorship or a meaningful opportunity to challenge such censorship. Again, these violations irreparably harmed HRDC. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) ("a deprivation of a constitutional right, for even minimal periods of time, unquestionably constitutes irreparable injury") (internal quotation marks and citation omitted).

The second factor also weighs in HRDC's favor, as legal remedies such as monetary damages are inadequate to compensate for the loss of First Amendment freedoms. *See Legend Night Club v. Miller,* 637 F.3d 291, 302 (4th Cir. 2011). This is particularly true for an organization like HRDC, whose primary purposes as a not-for-profit corporation are to inform subscribers, not to maximize profit. Monetary damages are simply inadequate compensation for the loss of HRDC's ability to freely communicate with its prisoner-subscribers.

In addition, although HRDC seeks monetary damages alongside the permanent injunction against Defendants, the challenges of quantifying these damages—especially as to the number of potential prisoner-subscribers who declined to subscribe to HRDC's publications because of Defendants' censorship—make the need for a permanent injunction even more acute. *See TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 792 (Fed. Cir. 2019) ("The inherent difficulty of . . . estimating monetary damages indicates that remedies at law are inadequate") (internal quotation marks and citation omitted). Defendants' censorship is ongoing and likely to continue without a permanent injunction. *See ServFaces GmbH v. Truong*, No. 2:19-CV-1906-APG-DJA, 2020 WL 854188, at *4 (D. Nev. Feb. 20, 2020) (finding legal remedies inadequate because "the infringement [was] ongoing").

The third factor also weighs in HRDC's favor, as "whatever burden injunction may impose on" Defendants is outweighed by HRDC's injury. Enjoining Defendants from ongoing violations of HRDC's rights "only prevents [Defendants] from pursuing a course of action which [they have] no legal right to pursue." *UBS Fin. Servs., Inc. v. Zimmerman*, No. 5:16-CV-155-FL, 2017 WL 2963445, at *3 (E.D.N.C. July 11, 2017); *see also Miller*, 637 F.3d at 302-03 (defendant was "in no way harmed by issuance of an injunction that prevented [it] from enforcing unconstitutional restrictions").

Lastly, the public interest is not disserved by a permanent injunction against Defendants. Instead, a permanent injunction would actually serve the interest of both the general public and the members of the select public incarcerated in North Carolina's state facilities. *See Legend Night Club*, 637 F.3d at 303 ("upholding constitutional rights is in the public interest"); *see also Human Rights Defense Center v. Sw. Virginia Reg'l Jail Auth.*, 448 F. Supp. 3d 581, 585 (W.D. Va. 2020) (public interest served by issuance of

-27-

permanent injunction against jail, in part because "[p]roviding adequate reading material to inmates serves the interest of rehabilitating inmates and of preventing security problems by avoiding idleness, boredom, and disruptive behavior") (internal quotation marks and citation omitted).

## VI.    CONCLUSION

Defendants have systematically and irrationally censored at least 20 of HRDC's publications since 2019, in violation of HRDC's First Amendment right to communicate with its subscribers. Defendants' failure to advise HRDC of many of its censorship decisions and to meaningfully consider all but one of HRDC's appeals also violates HRDC's Fourteenth Amendment right to due process.

For the reasons stated herein, Plaintiff HRDC respectfully moves this Court to grant HRDC's motion for summary judgment, enter a declaration that Defendants improperly censored HRDC's publications and failed to provide adequate due process, permanently enjoin Defendants from continuing to violate HRDC's rights under the First and Fourteenth Amendments, award HRDC reasonable attorneys' fees, and grant such further relief as may be just and proper.

Dated: August 4, 2023

By:    /s/   Ari Meltzer
Ari S. Meltzer (by special admission)
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000
ameltzer@wiley.law

EJ Hurst II (NC Bar No. 39261)
Human Rights Defense Center
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (561) 360-2523
Facsimile: (561) 828-8166
ejhurst@humanrightsdefensecenter.org

Elizabeth Simpson

EMANCIPATE NC
*Local Civil Rule 83.1(d) Counsel*
NC State Bar # 41596
P.O. Box 309
Durham, NC 27702
elizabeth@emancipatenc.org
(919) 682-1149

*Counsel for Plaintiff Human Rights Defense Center*

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2023, Plaintiff's Motion for Summary Judgment was served on all parties of record via the Court's ECF filing system.

James B. Trachtman
Special Deputy Attorney General
N.C. State Bar No. 22360
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602-0629
Telephone: (919) 716-6943; Fax: (919) 716-6761
E-mail: jtrachtman@ncdoj.gov

Shelby N. S. Boykin
Assistant Attorney General
N.C. State Bar No. 52404
N.C. Department of Justice
Public Safety Section
Post Office Box 629
Raleigh, North Carolina 27699-9001
Telephone: (919) 716-0444; Facsimile: (919) 716-6761
E-Mail: sboykin@ncdoj.gov

Bettina J. Roberts
Special Deputy Attorney General
N.C. State Bar No. 43356
N.C. Department of Justice
Public Safety Section
9001 Mail Service Center
Raleigh, North Carolina 27699-9001
Telephone: (919) 716-6540
Facsimile: (919) 716-6761
E-Mail: bjroberts@ncdoj.gov

By:     /s/   Ari Meltzer
        Ari S. Meltzer (by special admission)
        WILEY REIN LLP
        2050 M Street NW
        Washington, DC 20036
        (202) 719-7000
        ameltzer@wiley.law

        *Counsel for Plaintiff Human
        Rights Defense Center*