IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:21-CV-469-FL

| | | |
|---|---|---|
| HUMAN RIGHTS DEFENSE CENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TODD ISHEE, in his official capacity, TIM | ) | |
| MOOSE, in his individual and official | ) | |
| capacities; DARCELL CARTER, in his | ) | |
| individual and official capacities, LARRY | ) | |
| DUNSTON, in his individual and official | ) | ORDER |
| capacities, GARY BLEEKER, in his | ) | |
| individual and official capacities, | ) | |
| ZACHARY KENDALL, in his official and | ) | |
| individual capacities, WENDY HARDY, | ) | |
| SHANE THARRINGTON, and NORTH | ) | |
| CAROLINA DEPARTMENT OF ADULT | ) | |
| CORRECTION, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court upon plaintiff's motion for summary judgment (DE 77). The motion has been briefed fully, and in this posture the issues raised are ripe for ruling. For the following reasons, the motion is granted in part and denied in part.

## STATEMENT OF THE CASE

Plaintiff began this constitutional tort suit by filing complaint in this court November 12, 2021, which plaintiff amended October 17, 2022. The operative complaint asserts claims under 42 U.S.C. § 1983 for violation of plaintiff's constitutional rights under the First and Fourteenth Amendments to the United States Constitution by withholding plaintiff's publications from

distribution to prisoners.[1]  Plaintiff seeks a declaratory judgment that defendants are violating the Constitution, a permanent injunction against further violations, compensatory and punitive damages, and fees and costs.

Plaintiff filed the instant motion August 4, 2023, relying on numerous documents and exhibits including 1) defendants' depositions; 2) defendants' policies; 3) defendants' discovery responses; 4) various notices given to third party prison inmates; 5) other notices given directly to plaintiff; 6) plaintiff's publications; 7) various documents related to defendants' policies and procedures; and 8) affidavits from plaintiff's founder and its counsel.  Defendants have replied in opposition, relying on the same materials.

## STATEMENT OF FACTS

Plaintiff Human Rights Defense Center ("HRDC") is a non-profit organization that publishes two monthly periodicals: Prison Legal News ("PLN") and Criminal Legal News ("CLN").  (Defs' Statement Material Facts (DE 79) ("Defs' SMF") ¶ 1).[2]  PLN and CLN are newsprint publications that primarily contain articles related to criminal justice, prisons, and court rulings.  (Id. ¶ 2).  As of September, 2021, PLN had 162 inmate subscribers within the North Carolina correctional system, and CLN had 70 subscribers within the same.  (Id. ¶ 3).  HRDC has delivered its publications to prisoners across the country for 33 years and, to HRDC's knowledge, no disciplinary concern has ever arisen as a result of a prisoner receiving HRDC's publications. (Id. ¶¶ 4–5).

---

[1]       All further references in this order to the "complaint" refer to the operative amended complaint at docket entry (DE) 35.

[2]       Pursuant to Local Rule 56.1(a)(2), the court cites to paragraphs in the parties' statements of facts, or portions of such paragraphs, where not "specifically controverted by a correspondingly numbered paragraph in the opposing statement."  Because defendants' statement of material fact reproduces plaintiff's numbered statements of fact in full and then provides defendants' responses, the court cites to defendants' statement throughout this order for references to both sides' assertions.

Plaintiff sues numerous state actors: the North Carolina Department of Adult Correction ("NCDAC"), plus several of its officials. North Carolina launched the NCDAC as a cabinet-level agency January 1, 2023. (Id. ¶ 7). Before that date, North Carolina's prison system was administered by formerly-named defendant North Carolina Department of Public Safety ("NCDPS"). (Id.). NCDPS published a policy and procedure manual (the "manual"), which was binding on its facilities. (Id. ¶¶ 8–9). Part of the manual governed the receipt of publications by prisoners (the "publication policy").[3]

The publication policy states that NCDPS may withhold from prisoners publications that, among other grounds, can reasonably be documented to contain threats to institutional safety and security, or which reasonably have the potential to create an articulable threat to these objectives. (Id. ¶ 14). "Threats to institutional safety and security" include materials that depict, describe, advocate, or include 1) the commission of criminal activity or the violation of prison policies; 2) the manufacture or concealment of weapons or means of escape; 3) violence or disorder against individuals, groups, or any government institution; 4) violence against any ethnic or racial group that appears reasonably likely to provoke violence between the recipient and a member of the target group; 5) sexually explicit material that poses a threat to the security and good order of the prison. (Id. ¶ 15).

The publication policy also requires a prison reviewer to include a code identifying the reason for disapproving a publication, from among the above reasons or others. (Id. ¶ 16). A prison cannot reject a publication "solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant." (Id. ¶ 19). "Publications that provide unbiased reporting of actual news and events are not normally withheld." (Id. ¶ 20). The

---

[3] The court issued an order substituting defendants NCDAC and Todd Ishee in for former defendants NCDPS and Erik Hooks, respectively, March 31, 2023. (See Order (DE 63) 1).

publication policy also provides detailed procedures for warden review of publication withholding, appeals, and notification of withholding to the pertinent material's publisher.  (Id. ¶¶ 22–26).

Finally, the publication policy states that individual review of incoming publications is required, and lacks any procedures for banning all publications from particular publishers, unless all works from a publisher happen to have been disapproved after individual review.  (See id. ¶¶ 27–28).

Defendants notified HRDC that they had withheld several of HRDC's publications under the publication policy: 1) the December 2018 issue of PLN; 2) the December 2019 issue of PLN; 3) the February 2020 issue of PLN; 4) the April 2020 issue of PLN; 5) the June 2021 issue of PLN; 6) the May 2021 issue of PLN; 7) the December 2020 issue of CLN; and 8) HRDC's 2019 annual report.  (Id. ¶ 31).  HRDC timely appealed these decisions under the policy, but defendants did not formally review them, or send HRDC responses to the appeals.  (Id. ¶¶ 32–35).[4]

A document entitled "master list of disapproved publication[s]" dated November 6, 2019 to November 5, 2020 identifies HRDC as a disapproved publisher.  (See id. ¶¶ 43, 47–48). Defendants admit that HRDC should not have been added to this list, and that they do not know who added HRDC.  (Id. ¶ 50).  Defendants' officials have testified at their respective depositions that some publications defendants withheld from prisoners should not have been withheld for the reasons initially provided.  (See id. ¶¶ 61–62, 95).

Defendants' facilities subscribe to various newspapers.  (Id. ¶¶ 105, 109).  At least one facility automatically approves newspapers for distribution without any screening, and removes only items like coupons, which inmates cannot use.  (Id. ¶¶ 107–08).  Defendants also provided inmates with electronic tablets, which provided the same news content as was available to the

_____

[4]    Defendants dispute these facts, but for the reasons set forth in the analysis herein defendants have not demonstrated a genuine issue of material fact as to this issue of responses to plaintiff's appeals.

general public. (Id. ¶¶ 110–12). Finally, inmates in at least one facility were permitted to watch local news without oversight, including coverage of a protest at another North Carolina prison. (Id. ¶¶ 113–14).

## COURT'S DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary

5

judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.    Analysis

Plaintiff argues that it has established that defendants violated its due process and First Amendment rights,[5] so that summary judgment in its favor is proper. Defendants respond that qualified and sovereign immunity bar plaintiff's claims. The court agrees with each side, in part.

1.    First Amendment Claims

Plaintiff presents claims for improper censorship of its publications under the First Amendment. Specifically, plaintiff points to two actions by defendants: their alleged blanket ban on plaintiff's publications, and their allegedly improper withholding of specific issues of plaintiff's publications. The court sets out the applicable legal standard, then examines each in turn.

---

[5]      Plaintiff asserts its First Amendment rights through the Fourteenth Amendment, because the latter amendment incorporates the former against the states. N.Y. Times Co. v. Sullivan, 376 U.S. 254, 276–77 (1964). For simplicity's sake and because incorporation does not alter the court's substantive analysis, the court refers directly to the First Amendment throughout the remainder of the court's discussion.

Turner v. Safley, 482 U.S. 78 (1987) establishes the framework for evaluating challenges to prison regulations and administrative decisions. Turner sets out four factors: 1) whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interest used to justify it; 2) whether alternative means of exercising a right remain open to prisoners; 3) the impact accommodation of an asserted right will have on prison resources and administration; and 4) whether "ready alternatives" to the challenged regulation exist. Id. at 89–91.

The first factor requires, as a sub-element, that the regulation be neutrally applied. This requirement is not the content neutrality usually required in other areas of First Amendment doctrine, but instead that a regulation be applied against all content that violates its terms, and not selectively. See Morrison v. Garraghty, 239 F.3d 648, 660–61 (4th Cir. 2001) (holding that prison policy that practitioners of Native American religions with Native American ancestry could receive religious articles, but adherents of other racial backgrounds could not, failed first Turner factor); Jones v. Slade, 23 F.4th 1124, 1135–37 (9th Cir. 2022) (collecting cases from across the country and discussing this principle in detail); Mayfield v. Tex. Dep't of Crim. Justice, 529 F.3d 599, 608–09 (5th Cir. 2008) (same); Abu-Jamal v. Price, 154 F.3d 128, 133–34 (3d Cir. 1998) (to similar effect).

Finally, Turner placed strong emphasis on deference to prison administrators in matters of institutional security and administration. See id. at 84–85. The Turner framework applies in the specific area of prisoner publication receipt. See generally Thornburgh v. Abbott, 490 U.S. 401 (1989).

7

Blanket Ban on HRDC Publications

Plaintiff argues that defendants imposed a blanket ban on all its publications without any individual review, which fails to satisfy the <u>Turner</u> factors, especially the first.  (<u>See</u> Pl's Br. (DE 78) 15–19).  In response, defendants argue merely that no such blanket ban existed.  (<u>See</u> Defs' Br. (DE 83) 3–4).

i.    Existence of Blanket Ban

Plaintiff presents evidence that HRDC was placed on a list of disapproved publishers, whose works were rejected automatically and without individual consideration.  Plaintiff produces a document from defendants entitled "Master List of Disapproved Publication [sic][,]" which identifies 33 publisher entities, including HRDC.  (<u>See</u> Pl's App. SMF (DE 80) Ex. 6 (DE 80-6) 5).  Plaintiff also presents deposition testimony from NCDAC's Rule 30(b)(6) designee that the works of publishers on this list would be rejected and withheld without any individual consideration.  (<u>Id.</u> Ex. 1 (DE 80-1) 153:16–18).  Defendants respond only that no blanket ban existed, and argues that plaintiff's publications appeared instead on a list of disapproved specific works.  (<u>See</u> Defs' Br. 3–4).  But this distinction does not favor defendants, because plaintiff's thus-unrebutted evidence demonstrates that a list of disapproved <u>publishers</u> did exist, upon which HRDC appeared, and which was separate from another list of disapproved specific <u>works</u> upon which some of plaintiff's publications may also have appeared.  (<u>See</u> Pl's App. SMF Ex. 6 at 5; <u>id.</u> Ex. 1 at 80:10–19, 152:17–155:8).  And importantly, defendants' own publication policy expressly forbade such blanket bans.  (Defs' SMF ¶¶ 27–28).

Plaintiff has therefore produced unrebutted evidence that such list existed, and that HRDC was placed on it.  Defendants' sole argument against plaintiff's claims arising under this blanket

ban, that such ban did not exist, fails. The court now turns to whether the blanket ban constituted a violation of plaintiff's First Amendment rights.

ii.    Blanket Ban under First Amendment

Plaintiff asserts that blanket bans against its works without any individual consideration fail the Turner factors and therefore violated its First Amendment rights. The court agrees.

Under the first Turner factor, defendants' actions must have been rationally related to a legitimate and neutral governmental objective. Abbott, 490 U.S. at 414. Plaintiff does not dispute that defendants' advanced rationale, prison security and order, is a legitimate government interest. (Pl's Br. 14–15). Instead, plaintiff argues that defendants' decision to ban all HRDC publications without any individual review lacks a rational relationship to that goal. A regulation "cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Turner, 482 U.S. at 89–90.

Here, defendants' blanket censorship of all HRDC publications fails to satisfy this standard for four reasons.

First, Abbott expressed specific disapproval for prison censorship conducted without individual assessments. Abbott, 490 U.S. at 416–17.

Second, the blanket ban in this case violates defendants' own policies, which undermines any suggestion that blanket bans were necessary or even desirable means of furthering defendants' interests in institutional security and order. (See Defs' SMF ¶¶ 27–28). This violation is especially troubling given that, as plaintiff observes (Compl. ¶¶ 30–31), this court entered a consent decree in 2010 requiring NCDAC/NCDPS to "uniformly apply and enforce" these very policies. See

generally Stipulated Consent Decree, <u>Urbaniak v. Stanley</u>, No. 5:06-ct-03135-FL, (E.D.N.C. Aug. 27, 2010), ECF No. 133.[6]

Third, numerous other courts have recognized that widely written censorship regulations without individual review fail this factor. <u>See, e.g.</u>, <u>Human Rights Defense Ctr. v. Sw. Va. Regional Jail Auth.</u>, 396 F. Supp. 3d 607, 620 (W.D. Va. 2019) (blanket ban on all books); <u>Prison Legal News v. Stolle</u>, 319 F. Supp. 3d 830, 838–46 (E.D. Va. 2015) (collecting cases); <u>see also</u> <u>Lindell v. Frank</u>, 377 F.3d 655, 659–60 (7th Cir. 2004) (blanket ban on all publication clippings); <u>Shakur v. Selsky</u>, 391 F.3d 106, 115–16 (2d Cir. 2004) (blanket ban on all publications from non-approved publishers); <u>Williams v. Brimeyer</u>, 116 F.3d 351, 353–54 (8th Cir. 1997) (blanket ban on all materials from specific organization).

Fourth, courts also recognize that prison regulations fail the first factor's neutrality requirement when objects substantially similar to banned items are permitted within the prison. <u>See, e.g.</u>, <u>Morrison</u>, 239 F.3d at 660–61; <u>Slade</u>, 23 F.4th at 1136; <u>Cline</u>, 319 F. Supp. 2d at 692–93. Plaintiff has produced unrebutted evidence that its publications primarily contain news articles related to the criminal justice system, prisons, and court rulings, and that defendants permitted inmates to view paper, television, and internet news available to the general public in at least one facility. (<u>See</u> Defs' SMF ¶¶ 104–114). Defendants counter that different screening procedures governed these media, but admits that in at least one facility, newspapers were permitted without any screening whatsoever. (<u>See</u> Defs' Br. 5–6; Defs' SMF ¶¶ 104–05, 107–09). Defendants thus permitted news from other sources without any screening in at least one facility, but prohibited all news specifically from HRDC.

---

[6]     <u>Urbaniak</u> involved allegations similar to those here: the plaintiff was an inmate who sued NCDAC's predecessor and several of its officials for arbitrarily and wrongfully withholding publications he had ordered, and for refusing to properly process his appeals of those decisions. <u>See</u> <u>Urbaniak</u>, No. 5:06-ct-03135-FL (E.D.N.C. May 18, 2007), ECF No. 13.

In sum, on these grounds together, the blanket ban of all HRDC's publications is not rationally related to defendants' interest in institutional security, and therefore fails the first <u>Turner</u> factor.

The blanket ban also fails the second <u>Turner</u> factor: whether HRDC and its prisoner-subscribers had any alternative means to exercise their rights. The blanket ban inherently stifles any exercise of HRDC's and its subscribers' rights to communicate with each other by prohibiting any communication between them. <u>See</u> <u>Prison Legal News v. Nw. Regional Jail Auth.</u>, No. 5:15-cv-61, 2017 WL 4415659, at *6 (W.D. Va. Sept. 29, 2017) (recognizing that such bans left both publisher and subscribers without any alternative means to exercise their rights).

Finally, defendants' blanket ban fails the third and fourth <u>Turner</u> factors because defendants' own policies prohibited such bans. (Defs' SMF ¶¶ 27–28). This prohibition in defendants' policies is itself an acknowledgement that individual review, rather than blanket bans, would not pose a burden on prison administration, and that such review was an acceptable alternative. Defendants simply failed to follow their own policies.

Thus defendants' blanket ban of all HRDC publications without individual review violates plaintiff's First Amendment rights, and plaintiff's motion is granted on this claim under this theory.

        b.     Censorship of Individual Publications

Plaintiff argues that defendants' withholding of specific individual publications was unconstitutional. The court draws a distinction between specific publications defendants admit should not have been withheld, and those without a similar admission. The court concludes that plaintiff is entitled to summary judgment only on the first category.

The parties' briefing on this issue revolves around six specific publications: the September 2020 issue of PLN; the December 2020 issue of CLN; the December 2018 issue of PLN; HRDC's

2019 annual report; the June 2020 issue of PLN; and the April 2021 issue of PLN. (See Pl's Br. 20–24; Defs' Br. 4–5).

i.     Defendants' Admissions

Plaintiff contends that defendants admit that each of these six publications should not have been rejected, except for the April 2021 issue of PLN, so that their withholding failed to satisfy Turner factor one. The court examines these purported admissions sequentially.

First, defendants have admitted that the September 2020 issue of PLN "should have been approved." (Pl's App. SMF Ex. 7 (DE 80-7) ¶ 32). Defendants dispute this admission on grounds that the rejection rationale they supplied at the time provides that the publication was a threat to institutional security; however, the response merely acknowledges that this was the justification stated at the time of disapproval, not that that rationale should have been applied. (Id.). This earlier statement therefore does not contradict defendants' later admission that the issue should not have been withheld.

Second, defendants admit that nothing in the June 2020 issue of PLN was any different from other news coverage of the COVID pandemic. (See Pl's App. SMF Ex. 3 (DE 80-3) 121:2–17). This statement is, in effect, an admission that the June 2020 issue should have been approved, as discussed more fully below.

By contrast, defendants' other purported admissions do not support plaintiff in the way plaintiff suggests. First, plaintiff argues that defendants have admitted that the December 2020 issue should not have been withheld. However, the exhibit plaintiff uses for support states merely "I honestly don't see a reason that I can correlate." (See Pl's App. SMF Ex. 19 (DE 80-19) 156:12–13). The rest of the deposition testimony is completely redacted, so that the context around this statement, and to what it refers, is unclear. (See id.). Defendants dispute plaintiff's

12

characterization of this evidence on exactly this ground.  (See Defs' SMF ¶ 69).  The court therefore cannot deem this an admission.

Second, plaintiff argues that defendants have admitted that the December 2018 issue of PLN should not have been withheld.  Defendants indeed admit that nothing on one specific page of that issue posed a threat to institutional security.  (See Defs' SMF ¶ 77).  However, plaintiff's exhibit is heavily redacted in the manner discussed above, so that the court cannot determine to what this testimony refers outside of the parties' admissions and disputes.  (See Pl's App. SMF Ex. 3 at 117:21–24).  But defendants listed multiple pages and articles in this issue which justified withholding, as plaintiff concedes, (see Pl's Br. 20), and defendants dispute that the unclear admission here refers to anything other than a single article on a specific page.  (See Defs' SMF ¶ 77).  The court cannot deem this an admission that the withholding was improper.

The parties make the exact same arguments, and advance the same factual disputes, about plaintiff's 2019 annual report.  (See Pl's Br. 21; Defs' SMF ¶¶ 84–85).  The court therefore similarly cannot deem this an admission.

Finally, plaintiff does not contend that the defendants made any admission regarding the April 2021 issue.  (See Pl's Br. 23–24).

ii.     Effects of Defendants' Admissions

Having examined each of defendants' supposed admissions, the court turns to their effects in this case.

First, the withholding of the September 2020 and June 2020 issues is improper. Defendants admitted that the September 2020 issue should not have been withheld.  This admission eliminates any possible rational connection between defendants' legitimate interests and the withholding of this publication.  See, e.g., Prison Legal News v. Ryan, 39 F.4th 1121, 1137 (9th Cir. 2022) (stating

that censorship outside terms of regulation "cannot have been" rationally related to goals under first Turner factor). The withholding of this publication fails the first Turner factor, which is dispositive. See Shaw v. Murphy, 532 U.S. 223, 229–30 (2001).

In addition, the June 2020 issue of PLN was withheld because it contained information about COVID-19, but defendants now admit that the articles in question were no different from other pandemic related news coverage. (Pl's App. SMF Ex. 3 at 121:2–17). Defendants therefore withheld HRDC's publications while permitting similar uncensored news stories from other sources via newspapers as discussed above. Because defendants did not apply their regulation neutrally as contemplated by Turner, the withholding of this issue also dispositively fails the first Turner factor. Shaw, 532 U.S. at 229–30; see Morrison, 239 F.3d at 660–61; Slade, 23 F.4th at 1136; Price, 154 F.3d at 133–34.

Next, the court turns to the three publications about which defendants dispute any admission, and the one publication on which plaintiff does not even argue that an admission occurred. As discussed above, defendants dispute any admission on the December 2020 issue of CLN, the December 2018 issue of PLN, and HRDC's 2019 annual report. Defendants withheld these publications because, in defendants' view, they posed a threat of inciting disorder or violence. (Defs' SMF ¶¶ 74, 81). In addition to the argument on defendants' purported admissions, plaintiff contends merely that no jury could agree that these articles posed these risks. (See Pl's Br. 20–21). Plaintiff makes the same argument alone about the April 2021 issue of PLN. (Id. 23). However, Turner and its progeny have consistently emphasized the heavy deference courts owe to prison administrators in making judgments, especially about institutional security and safety. See, e.g., Turner, 482 U.S. at 89; Beard v. Banks, 548 U.S. 521, 528 (2006); Heyer v. U.S. Bureau of Prisons, 984 F.3d 347, 355–56 (4th Cir. 2021); Montcalm Pub. Corp. v. Beck, 80

14

F.3d 105, 108 (4th Cir. 1996).  Under this standard, and at summary judgment, the court cannot conclude that defendants' proffered explanations for withholding these publications were incorrect or pretextual.  The withholding of these four publications therefore satisfies the first <u>Turner</u> factor.

The other <u>Turner</u> factors are mixed.  The second factor favors plaintiff because these publications were withheld in their entirety, without any attempt to remove particular material. (Defs' SMF ¶ 30).  This left HRDC without any other means of communicating the material in these issues.  The third and fourth factors strongly favor defendants, because permitting these particular publications into defendants' facilities would have contradicted the very rationale for withholding them: that they posed risks to institutional security.  Admitting these issues therefore would have posed an intolerable burden on defendants, to which there were no alternatives.

Thus, the rejection of these four publications was permissible under the four <u>Turner</u> factors.

Having examined the withholding of the six specific publications at issue, the court concludes as follows: 1) the withholding of the September 2020 and June 2020 issues of PLN violates plaintiff's First Amendment rights; 2) the withholding of the December 2020, December 2018, and April 2021 issues of PLN, and plaintiff's 2019 annual report, does not.

2.      Due Process

Plaintiff argues that defendants violated its rights to due process in three ways: by failing to provide notice that defendants had rejected specific publications; by failing to provide notice of the imposition of the blanket ban; and by failing to respond to plaintiff's timely appeals of those decisions.  The court agrees with the latter two points.

The law on these issues is clear-cut.  A publisher is entitled to notice and an opportunity to be heard when a prison disapproves one of its publications.  <u>Beck</u>, 80 F.3d at 106.

The parties' respective statements of facts on the notice issue are perplexing. Plaintiff's statement submits that defendants provided notice that defendants had rejected 20 specific publications. (See Defs' SMF ¶ 31). This assertion seemingly defeats plaintiff's own due process notice claim, insofar as it rests upon a failure to provide notice for these publications. However, defendants' statement of facts single-handedly resuscitates this claim by denying that defendants sent any notice to plaintiff regarding 12 of the 20 named publications.[7] (See Defs' SMF ¶ 31). The parties therefore create an issue of fact on notice for these particular publications, albeit in an unusual fashion.

In addition, defendants do not present a genuine issue of material fact as to whether they provided any notice of the blanket ban against plaintiff's publications. (See Defs' SMF ¶¶ 50–52). Defendants merely state that they could not locate records on this issue. (See id.). This response fails to satisfy defendants' burden to produce specific facts showing an issue for trial as to notice to plaintiff regarding the blanket ban against plaintiff's publications. See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); English v. Pabst Brewing Co., 828 F.2d 1047, 1050 (4th Cir. 1987) (affirming refusal to permit lack of memory to create an issue of fact against other side's evidence); Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (proscribing creating issue of fact through "speculation"); I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc., 182 F.3d 51, 55 (1st Cir. 1999) ("mere lack of recollection does not . . . create an issue of fact"); Posey v. Skyline Corp., 702 F.2d 102, 105–06 (7th Cir. 1983) (to similar effect); Lee v. City of Richmond, Va., 100 F. Supp. 3d 514, 523 (E.D. Va. 2015) (stating that "lack of

---

[7] Defendants dispute that they provided notice as to the following publications: 1) the June 2020 issue of PLN; 2) the July 2020 issue of PLN; 3) the September 2020 issue of PLN; 4) the November 2020 issue of PLN; 5) the December 2020 issue of PLN; 6) the October 2020 issue of PLN; 7) the April 2021 issue of PLN; 8) the December 2018 issue of CLN; 9) the August 2020 issue of CLN; 10) the September 2020 issue of CLN; 11) the January 2021 issue of CLN; and 12) plaintiff's 2017 annual report. (See Defs' SMF ¶ 31).

recollection" cannot create an issue of fact); <u>Abdelnaby v. Durham D & M LLC</u>, No. GLR-14-3905, 2017 WL 3725500, at *4 (D. Md. Aug. 29, 2017) (holding that party could not create genuine issue of material fact merely by gesturing at a lack of records). The court therefore considers these facts to be undisputed.

Similarly, defendants produce nothing to rebut plaintiff's evidence that plaintiff appealed defendants' withholding of several publications, but that they failed to timely review or respond to these appeals. (<u>See</u> Defs' SMF ¶¶ 32–35). Defendants do not dispute that plaintiff appealed, and they dispute only timeliness and whether they failed to provide a response, on grounds of lack of records. (<u>See</u> <u>id.</u>). This showing is insufficient, as stated above.

In sum, an issue of fact exists on whether plaintiff received adequate notice of the rejection of its specific publications. This claim will therefore proceed to trial in part under this theory. However, the court will grant plaintiff's motion insofar as it requests summary judgment and plaintiff's requested prospective remedies on defendants' failure to review or respond to plaintiff's appeals, and on defendants' failure to provide notice of the imposition of the blanket ban against plaintiff's publications.

3.    Qualified and Sovereign Immunity

Defendants argue that they are entitled to qualified and sovereign immunity, barring all of plaintiff's claims. The court concludes that defendants are entitled to qualified immunity against plaintiff's First Amendment claims, but not against its due process claims. The court further decides that only NCDAC is entitled to sovereign immunity.

a.    Qualified Immunity

Qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory

or constitutional rights of which a reasonable would have known." Iko v. Shreve, 535 F.3d 225, 237 (4th Cir. 2008). A plaintiff thus must make two showings: a violation of a constitutional right, and that that right was "clearly established" at the time of the alleged conduct. Pfaller v. Amonette, 55 F.4th 436, 444 (4th Cir. 2022).

The court has concluded above that plaintiff has shown a violation of its First Amendment and due process rights, at least under some theories, and so focuses on the second prong: whether these particular rights were clearly established.

Officials' actions violate clearly established rights only if their unlawfulness is apparent in light of preexisting law. Iko, 535 F.3d at 237–38. Under this standard, officials must show only the legal knowledge of an objectively reasonable official in similar circumstances. Id. at 238. Officials are liable for transgressing only "bright lines," not for "bad guesses in gray areas." Id. Finally, the Supreme Court has emphatically instructed that, for the purposes of this prong, rights must be established with a high degree of specificity, so that "existing precedent must have placed the [legal] question beyond debate." Kisela v. Hughes, 138 S. Ct. 1148, 1152–53 (2018). In making this determination, the court ordinarily looks only at the law as established by the Supreme Court, the Fourth Circuit and, in this case, the Supreme Court of North Carolina. See Booker v. S.C. Dep't of Corrs., 855 F.3d 533, 538 (4th Cir. 2017); Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999). However, the court may also consider a "consensus of cases of persuasive authority from other jurisdictions." Booker, 855 F.3d at 539. The court now turns to plaintiff's claims with this framework in mind.

First, that defendants' blanket ban here violates plaintiff's First Amendment rights was not clearly established at the time. Plaintiff points to no decision of the Supreme Court, Fourth Circuit, or Supreme Court of North Carolina holding such a policy unconstitutional under the Turner

analysis. Further, although the court drew upon precedent in concluding that this policy violates plaintiff's First Amendment rights, such authority does not clearly establish the rights at issue. To start, Abbott expressed disapproval for blanket bans, but did not expressly hold them unconstitutional; Abbott's language thus lends support for the conclusion that such bans are unconstitutional, but does not clearly establish this proposition for purposes of qualified immunity. Next, some district courts, and other federal courts of appeal, have ruled such bans unconstitutional. However, district court decisions cannot clearly establish rights under the qualified immunity framework. Booker, 855 F.3d at 538 n.1. And although Frank, Selsky, and Brimeyer supported the court's conclusion that defendants violated plaintiff's First Amendment rights, they are not a "consensus" of persuasive authority sufficient to hold a right clearly established in the absence of controlling authority. See Brosseau v. Haugen, 543 U.S. 194, 200–01 (2004) (holding that cases from Sixth, Seventh, and Eighth Circuits did not clearly establish a right in the Ninth Circuit); cf. Booker, 855 F.3d at 544–45 (stating that agreement across ten of the federal courts of appeal constituted a sufficient consensus).

Finally, only two Fourth Circuit cases have examined Abbott in the incoming mail context. Neither governs here: Beck examined the publisher's right to due process, and offered little guidance on the Turner factors in this setting. Next, Hause v. Vaught, 993 F.2d 1079 (4th Cir. 1993) upheld a blanket ban on all outside publications, rather than a blanket ban against a single disfavored publisher or category. See id. at 1082–84. Hause therefore does not control here because of this critical distinction. Thus, no controlling authority applies Turner and Abbott as required to clearly establish the rights at issue here.

19

The court therefore concludes that the unconstitutionality of defendants' blanket ban against plaintiff's publications is not clearly established, and that defendants are entitled to qualified immunity against this claim.

Next, the withholding of the September, 2020 and June, 2020 issues does not violate clearly established law. The court has concluded that these decisions failed Turner's neutrality requirement. However, the principle that a regulation fails the neutrality requirement if substantially similar items or works are permitted is a gloss placed on this holding by non-binding authority, or by binding authority in very different context. See Morrison, 239 F.3d at 660–61 (applying principle in different context to different constitutional right); Price, 154 F.3d at 133–34 (same); Slade, 23 F.4th at 1137; Cline, 319 F. Supp. 2d at 692–93. But see Slade, 23 F.4th at 1138 ("we agree with [prison's] assertion that the test is not whether all possible content that could be excluded is actually excluded"). This is insufficient to clearly establish a right for qualified immunity purposes. See, e.g., Booker, 855 F.3d at 538–39. Further, no Fourth Circuit case discusses this principle in this context either approvingly or disapprovingly. See generally Beck, 80 F.3d 105; Hause, 993 F.2d 1079. Thus, the decisions to withhold these publications did not violate clearly established rights, and defendants are entitled to qualified immunity on these claims.

Next, however, defendants are not entitled to qualified immunity against plaintiff's due process claims. Beck is directly controlling authority applicable to these facts at a close level of specificity, which requires that a publisher receive notice and an opportunity to be heard when its works are withheld. See Beck, 80 F.3d at 106. As discussed above, plaintiff has demonstrated the violation of these rights, which were clearly established nearly 30 years ago under Beck. Defendants are therefore not entitled to qualified immunity on plaintiff's due process claims.

Finally, qualified immunity has no application to requests for injunctive or declaratory relief. Wall v. Wade, 741 F.3d 492, 498 n.9 (4th Cir. 2014); S.C. State Bd. of Dentistry v. FTC, 455 F.3d 436, 446–47 (4th Cir. 2006). The court's rulings granting qualified immunity thus apply only to plaintiff's requests for damages.

In sum, defendants are entitled to qualified immunity against plaintiff's First Amendment claims for damages, under plaintiff's blanket ban and improper specific rejection theories. However, defendants are not entitled to such immunity against plaintiff's due process claims.

        b.      Sovereign Immunity

Defendants argue that they are entitled to sovereign immunity against all of plaintiff's claims. The court agrees in part: only NCDAC is entitled to such immunity.

Plaintiff sues a constellation of state actors. Plaintiff requests only injunctive relief from NCDAC, and sues each individual official in the official capacity for declaratory and injunctive relief, and in the individual capacity for damages and injunctive relief. (See Compl. ¶¶ 8–18).

The Eleventh Amendment provides immunity from suit to states and their agencies and arms. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101–02 (1984). But it does not bar requests for prospective relief, such as injunctive or declaratory relief, against state officials. See Antricam v. Odom, 290 F.3d 178, 188–90 (4th Cir. 2002); Bragg v. W. Va. Coal Ass'n, 248 F.3d 275, 292 (4th Cir. 2001).

This exception applies only to state officials, not to state agencies or divisions. See Biggs v. N.C. Dep't of Public Safety, 953 F.3d 236, 242 (4th Cir. 2020) (recognizing that "state officials – not state institutions – can be sued for equitable relief under § 1983" (emphasis in original)); Lee-Thomas v. Prince George's Cnty. Public Schs., 666 F.3d 244, 248–49 (4th Cir. 2012) (discussing only "officers"); Rehab. Ass'n of Va. v. Kozlowski, 42 F.3d 1444, 1449 (4th Cir. 1994)

(holding exception applicable because plaintiff sought prospective relief against state official, not state or agency).

NCDAC/NCDPS is an arm of the state of North Carolina and therefore enjoys sovereign immunity. See Biggs, 953 F.3d at 241–42; Harwood v. Johnson, 326 N.C. 231, 238 (1990) (same for NCDPS's institutional predecessor); see also Darden v. Cooper, No. 1:19cv1050, 2020 WL 7774381, at *2 (M.D.N.C. Dec. 30, 2020). Sovereign immunity therefore blocks all of plaintiff's claims against NCDAC, but not against the individual defendants in the official capacity, against whom plaintiff does not request monetary damages.

Next, plaintiff sues the individual defendants in the individual capacity, requesting damages. Sovereign immunity does not proscribe damages suits against officials in the individual capacity. See Adams v. Ferguson, 884 F.3d 219, 224–25 (4th Cir. 2018). Sovereign immunity therefore has no application to these claims.[8]

Thus, sovereign immunity does not shield the individual defendants. Claims against them are constrained only as stated in the court's discussion of qualified immunity above.

In sum, having considered the parties' immunity arguments the court concludes, on its own initiative under Federal Rule of Civil Procedure 56(f)(1), that NCDAC and the individual defendants have established their sovereign and/or qualified immunities as a matter of law, and are therefore entitled to summary judgment in their favor on these issues as outlined above and in this paragraph. On plaintiff's claims against the individual defendants, the court grants summary judgment in defendants' favor against plaintiff's First Amendment claims insofar as they seek

---

[8]    The court acknowledges that sovereign immunity can sometimes apply to individual capacity suits presented under certain federal statutes. See, e.g., Cunningham v. Lester, 990 F.3d 361, 363, 367–68 (4th Cir. 2021) (Telephone Consumer Protection Act); Martin v. Wood, 772 F.3d 192, 194–96 (4th Cir. 2014) (Fair Labor Standards Act). However, subsequent binding precedent has clarified that these cases are limited to the statutes under which they arose and to similar comprehensive statutory remedial schemes, and expressly rejected application of their principles to suits under § 1983. Adams, 884 F.3d at 225–26.

damages, but grants plaintiff summary judgment in its favor insofar as these claims seek declaratory and injunctive relief. Further, plaintiff is entitled to summary judgment on its due process claims under its notice of blanket ban and opportunity to be heard theories, but plaintiff presents no evidence on its damages. The court therefore grants plaintiff summary judgment on defendants' liability under these claims, but these claims will proceed to trial on the issue of plaintiff's damages. Plaintiff's due process claim will also proceed to trial insofar as it rests upon an alleged failure to give notice of rejection of specific publications.

    4.      Injunctive and Declaratory Relief

Plaintiff has requested declaratory judgment that defendants violated their First Amendment and due process rights, and a permanent injunction restraining future violations.

        a.      Declaratory Judgment

A district court may grant a request for declaratory judgment when three elements are met: 1) the complaint alleges an actual controversy between the parties of sufficient immediacy to warrant a declaratory judgment; 2) the court possesses jurisdiction over the parties; and 3) the court does not abuse its discretion in issuing such judgment. See Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 592 (4th Cir. 2004). In exercising its discretion, the court should consider whether the declaratory judgment sought 1) will serve a useful purpose in clarifying and settling the legal relations at issue; 2) will terminate and afford relief from the controversy giving rise to the proceeding; 3) is being sought as a procedural maneuver to sidestep procedural obstacles such as res judicata, as well as 4) concerns of federalism and comity. See Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co., 139 F.3d 419, 422 (4th Cir. 1998); Norfolk Dredging Co. v. Phelps, 433 F. Supp. 2d 718, 722 (E.D. Va. 2006).

Declaratory judgment is appropriate here. First, plaintiff alleges that the violations here are ongoing (Compl. ¶¶ 115–120), while defendants dispute that their actions were unconstitutional; the complaint therefore alleges an actual and immediate controversy. Second, the court possesses federal question jurisdiction over this action, 28 U.S.C. §§ 1331, 1343, and no party disputes personal jurisdiction. Third, the factors guiding the court's discretion weigh in favor of declaratory judgment. Given the controversy between the parties, a declaratory judgment clarifying that defendants are violating plaintiff's rights would serve a useful purpose; the declaration will afford plaintiff relief; there is no evidence that plaintiff is improperly attempting to sidestep procedural obstacles; and federalism does not entitle state officials to deny rights guaranteed by the United States Constitution. See, e.g., Ross v. Meese, 818 F.2d 1132, 1134–35 (4th Cir. 1987); Courthouse News Serv. v. Schaefer, 440 F. Supp. 3d 532, 561–62 (E.D. Va. 2020).

The court therefore issues a declaratory judgment as detailed below.

b.      Permanent Injunction

Finally, plaintiff contends that it is entitled to a permanent injunction. The court agrees. However, plaintiff does not adequately specify the terms of its requested injunctive relief, so the court reserves ruling on the scope of injunctive relief pending supplemental briefing, as set out below.

i.      Entitlement

A plaintiff seeking a permanent injunction must demonstrate that 1) it has suffered an irreparable injury; 2) remedies at law such as damages are inadequate compensation for that injury; 3) such remedy in equity is warranted under the balance of hardships; and 4) the public interest would not be disserved by a permanent injunction. Legend Night Club v. Miller, 637 F.3d 291, 297 (4th Cir. 2011).

The first factor favors plaintiff. Deprivation of rights secured under the First Amendment constitutes irreparable injury for these purposes. See, e.g., Miranda v. Garland, 34 F.4th 338, 365 (4th Cir. 2022); Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd., 354 F.3d 249, 261 (4th Cir. 2003).

Second, remedies at law such as damages are inadequate compensation for the deprivation of constitutional rights. See Miller, 637 F.3d at 302.

Third, the balance of hardships favors an injunction, because defendants cannot be harmed by issuance of an injunction prohibiting them from enforcing unconstitutional policies or regulations. Newsom, 354 F.3d at 261.

Finally, the public interest will be served by an injunction, because "upholding constitutional rights serves the public interest." Id.; see Miller, 637 F.3d at 303. Further, remedying constitutional violations in this specific context furthers the public interest in rehabilitating prisoners and preventing possible security problems exacerbated by idleness. Human Rts. Def. Ctr. v. Sw. Va. Regional Jail Auth., 448 F. Supp. 3d 581, 586 (W.D. Va. 2020).

The court therefore concludes that plaintiff is entitled to a permanent injunction.

ii.    Scope

Although the court concludes that plaintiff is entitled to a permanent injunction, the court cannot grant such relief upon the current record.

Any injunctive relief must describe in detail the acts restrained or required. Fed. R. Civ. P. 65(d)(1)(C). These "are not mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." Schmidt v. Lessard, 414 U.S. 473, 476 (1974). Thus, injunctive relief must state in clear and specific terms

its operation upon the enjoined party.  See, e.g., Wudi Indus. (Shanghai) Co., Ltd. v. Wong, 70 F.4th 183, 189–90 (4th Cir. 2023); CPC Int'l, Inc. v. Skippy Inc., 214 F.3d 456, 459 (4th Cir. 2000).

Rule 65 prohibits the court from fashioning injunctive relief by referring to the complaint or similar documents, see Fed. R. Civ. P. 65(d)(1)(C), but plaintiff's filings fail to provide even loose guidance on the scope and terms of plaintiff's requested relief.  (See Pl's Br. 31–33; Pl's Reply Br. (DE 84) 9; Compl. 26).  Instead, these filings merely request that the court prohibit defendants from violating the Constitution.  While the particular acts of which plaintiff complains provide clues about plaintiff's requested relief, the court is unwilling to enter a permanent injunction based upon such inferences.  The court thus concludes that it cannot issue injunctive relief compliant with Rule 65 at this stage because plaintiff's requested injunctive relief is too vague to grant, and therefore orders supplemental briefing on this issue below.

## CONCLUSION

For the forgoing reasons, plaintiff's motion for summary judgment (DE 77) is GRANTED in part and DENIED in part:

1.  The motion is GRANTED on plaintiff's due process claim, and the court enters summary judgment in plaintiff's favor on liability, insofar as it rests upon:

    a.  failure to provide an opportunity to be heard; and

    b.  defendants' failure to give notice of defendants' blanket ban against plaintiff's publications.

2.  The motion is DENIED on plaintiff's due process claim insofar as it seeks summary judgment on defendants' failure to provide notice of rejection of specific publications, or on plaintiff's damages; these issues shall proceed to trial;

26

3.    The motion is GRANTED on plaintiff's First Amendment claim insofar as plaintiff seeks declaratory and injunctive relief on those claims;

4.    The motion is DENIED and the court on its own initiative under Rule 56(f) grants summary judgment in favor of defendants on that part of plaintiff's First Amendment claims seeking monetary damages, and such claims are hereby DISMISSED on the basis of qualified immunity.

5.    The motion is DENIED and the court on its own initiative under Rule 56(f) grants summary judgment in favor of defendants on that part of plaintiff's claims seeking any relief from NCDAC/NCDPS, and such claims are hereby DISMISSED due to sovereign immunity.

The court hereby ENTERS declaratory judgment in plaintiff's favor as follows. This declaratory judgment applies only to the individual defendants.

1.    Individual Defendants' ongoing practice of banning all publications from plaintiff without individual consideration violates plaintiff's First Amendment rights;

2.    Individual Defendants' ongoing withholding of the September 2020 and June 2020 issues of PLN violates plaintiff's First Amendment rights;

3.    Individuals Defendants' ongoing failure to review or respond to plaintiff's appeals of their decisions to reject plaintiff's publications violates plaintiff's due process right to be heard, as secured by the Fourteenth Amendment;

4.    Individual Defendants' ongoing failure to notify plaintiff that its publications have all been rejected as a blanket matter violates plaintiff's due process right to notice, as secured by the Fourteenth Amendment.

The court ORDERS as follows regarding plaintiff's request for a permanent injunction:

1.  Within 14 days of the entry of this order, plaintiff shall file a supplemental brief clarifying the specific terms and scope of its requested injunctive relief within the meaning and requirements of Federal Rule of Civil Procedure 65(d).

2.  Defendants shall have 14 days from the filing of plaintiff's supplemental brief to respond to plaintiff's clarification of the terms and scope of its requested injunctive relief.

3.  The parties' supplemental briefs shall be limited to such terms and scope, and shall not seek to re-litigate any other matter adjudicated in this order.

4.  After receiving the parties' supplemental briefs, the court will enter such further order as is warranted regarding plaintiff's request for a permanent injunction.

In accordance with the case management order entered April 26, 2022, as amended July 11, 2022, this case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial. The parties are DIRECTED to confer and file within **14 days** from the date of this order a joint status report informing the court of 1) estimated trial length; 2) particular pretrial issues which may require court intervention in advance of trial, if any; and 3) at least three suggested alternative trial dates. The parties shall specify if they wish to schedule a court-hosted settlement conference or additional alternative dispute resolution procedures in advance of trial, and if so the date for completion of such.

SO ORDERED, this the 27th day of March, 2024.

LOUISE W. FLANAGAN
United States District Judge

28